906 A.2d 1089

**STATE of Maryland**

v.

**Michael Jackson OFORI.**

**No. 0267, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 8, 2006.

212

214

Steven L. Holcomb (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Matthew Davies (Douglas J. Wood, on brief), Riverdale, for appellee.

Panel MURPHY, C.J., CHARLES E. MOYLAN, JR., (Retired, specially assigned), and THEODORE G. BLOOM, (Retired, specially assigned), JJ.

MOYLAN, J.

The appellee, Michael Jackson Ofori, was indicted by the Grand Jury for Prince George's County for six separate counts involving controlled dangerous substances and handgun violations. He filed a pretrial motion in the Circuit Court for Prince George's County, seeking to have the physical evidence suppressed on the ground that the search that led to the evidence violated the Fourth Amendment of the United States Constitution. The motion to exclude the evidence was granted.

## A State Appeal

The State has appealed, pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12-302(c), which provides in pertinent part:

(c) *Criminal case.*—In a criminal case, the State may appeal as provided in this subsection.

. . . .

(3)(i) In ... cases under §§ 5-602 through 5-609 and §§ 5-612 though 5-614 of the Criminal Law Article, *the State may appeal from a decision of a trial court that excludes evidence offered by the State* or requires the return of property *alleged to have been seized in violation of the Constitution of the United States,* the Constitution of Maryland, or the Maryland Declaration of Rights.

. . .

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. *The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.*

(iv) If the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is

affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken.

(Emphasis supplied). Accordingly, our decision in this case, should we opt to reverse, must be filed no later than September 14, 2006.

## Standard of Review

Several factual issues will be significant factors in our ultimate resolution of the appeal, and it behooves us to set out clearly the rules of review on fact-finding. First and foremost is that of deference to the non-clearly-erroneous fact-finding of the hearing judge. *Morris v. State*, 153 Md.App. 480, 489, 837 A.2d 248 (2003), *cert. denied*, 380 Md. 618, 846 A.2d 402 (2004), described that primary standard of fact-finding review.

> *The most basic rule of appellate review of fact-finding is that of extending great deference to the fact finder,* be it judge or jury. Appellate judges do not see or hear the witnesses or have the benefit of any sort of non-verbal communication. They are relatively far less able to assess credibility than are the fact finders on the scene. Appellate judges, moreover, are not immersed in the local context and do not get the sometimes inexpressable "feel" of the case. They are relatively far less able to weigh the evidence than are the fact finders on the scene. *The basic rule of fact-finding review, therefore, is that the appellate court will defer to the fact-findings of trial judge* or jury *whenever there is some competent evidence which,* if believed and given maximum weight, *could support such findings of fact. That is the prime directive.*

(Emphasis supplied).

In this case, however, that primary rule of fact-finding review is totally inapplicable. The hearing court made no findings of fact but raced straight to its unadorned constitutional conclusion:

> THE COURT: All right. *Motion to Suppress Search and Seizure is granted.*

> MR. WOOD: Thank you, Your Honor.

THE COURT: *I don't think it was reasonable.*

MS. ENGEL: *The Motion to Suppress is granted?*

THE COURT: *Yes.*

(Emphasis supplied).

That lack of judicial fact-finding, however, does not mean that we need not review the factual evidence in the case to see what conclusions will be drawn from the evidence. It is precisely in such a situation that the supplemental rule of fact-finding review comes into play. It was also explained in *Morris v. State*, 153 Md.App. at 489–90, 837 A.2d 248:

> Sometimes the hearing judge may simply have made a ruling on suppression without announcing any findings of fact. How then does the appellate court, in reviewing a suppression hearing ruling, *fill those fact-finding gaps*, partial or total? *What does the appellate court do when there is no fact-finding, or incomplete fact-finding, to which to defer?*
>
> *It is here that the supplemental rule of interpretation comes into play.* In determining whether the evidence was sufficient, as a matter of law, to support the ruling, *the appellate court will accept that version of the evidence most favorable to the prevailing party.* It will fully credit the prevailing party's witnesses and discredit the losing party's witnesses. It will give maximum weight to the prevailing party's evidence and little or no weight to the losing party's evidence. *It will resolve ambiguities and draw inferences in favor of the prevailing party* and against the losing party. It will perform the familiar function of deciding whether, as a matter of law, a *prima facie* case was established that could have supported the ruling.
>
> *This is,* however, *the supplemental rule that is only brought to bear on the record of the suppression hearing when the hearing judge's fact-finding itself is 1) ambiguous, 2) incomplete, or 3) non-existent.* The supplemental rule guides the appellate court in resolving fact-finding ambiguities and in filling fact-finding gaps.

(Emphasis supplied). And see *Charity v. State,* 132 Md.App. 598, 606, 753 A.2d 556 (2000).

In this case, the prevailing party at the suppression hearing was the appellee. When different plausible versions of the facts, including inferences that may fairly be drawn therefrom, are presented by the record, we will assume as true that version most favorable to the appellee.

■ With respect to the ultimate conclusion of whether the Fourth Amendment was violated, we must make, *de novo,* our own independent constitutional appraisal. *State v. Carroll,* 383 Md. 438, 445–46, 859 A.2d 1138 (2004); *Dashiell v. State,* 374 Md. 85, 93–94, 821 A.2d 372 (2003); *Rowe v. State,* 363 Md. 424, 432, 769 A.2d 879 (2001); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Wynn v. State,* 117 Md.App. 133, 165, 699 A.2d 512 (1997), *reversed on other grounds,* 351 Md. 307, 718 A.2d 588 (1998); *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990).

## The Investigative Continuum

In making our independent constitutional appraisal, our focus will be on the Fourth Amendment reasonableness of the length of time that the appellee was detained by the police. The investigative continuum that concerns us began on October 27, 2005, at approximately 12:20 p.m., when Officer Geoffrey Shaffer, of the City of Laurel Police Department, made a traffic stop of the black Cadillac being driven by the appellee. The appellee was stopped for two traffic infractions. One was for failing to give a left-turn signal when turning left onto Route 97 from Hechingers Drive. Maryland Code, Transportation Article, § 21–604. The other was for having tinted car windows of a tint darker than the 35 percent allowed by law. Maryland Code, Transportation Article, § 22–406(i).

Officer Shaffer approached the driver's side of the Cadillac and asked the appellee for his driver's license and registration card. He testified:

I was given a license and registration. *The license was a D.C. license with name and picture of an Anthony Kyle Dukes,* and *that picture did not match the driver.*

(Emphasis supplied).

Officer Shaffer returned to his patrol car. He attempted to get a computer check on the D.C. license that had been given him in the name of Anthony Kyle Dukes. He also requested that a K–9 unit be sent to the scene. While still inside his vehicle, Officer Shaffer also began writing an equipment repair order, as well as a written warning for the turn signal violation.

Officer James Brooks, a K–9 handler, testified that he received the call to come to the scene at "approximately 12:30 p.m." and that he arrived at the scene "ten minutes later, 12:40." After being briefed by Officer Shaffer, Officer Brooks had his dog scan the Cadillac. The dog made a positive "alert," one that was particularly strong in the area of the driver's door. The officers removed the appellee and his passenger from the vehicle and then searched it. From inside the door panel on the driver's side, they recovered suspected marijuana, suspected PCP, and a black handgun. From inside the door panel on the passenger's side, they recovered another handgun.

After the recovery of the physical evidence from the car, both the appellee and his passenger were placed under arrest. A search of the appellee incident to his arrest revealed a large quantity of U.S. currency. With respect to wrapping up the original traffic stop, Officer Shaffer's direct examination was as follows:

Q. And at the time that you placed the Defendant under arrest, had you fully completed what you needed to do in order to conclude the traffic stop?

A. No, because I had yet to completely identify the driver because I had not gotten a good name for him.

Along the time line of that continuum, we are concerned with fixing two points and with assessing the Fourth Amend-

ment reasonableness of the length of time that elapsed in getting from the first point to the second.

### The Initial Traffic Stop: The Clock Begins to Tick

The event from which we begin to measure the passage of time is easy, even if the precise time itself is not quite so susceptible to being pinpointed. Our assessment begins, of course, with the initiation of the traffic stop. That is the moment the Fourth Amendment detention of the appellee begins. *Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491 (1999); *Munafo v. State,* 105 Md.App. 662, 670, 660 A.2d 1068 (1995); *Snow v. State,* 84 Md.App. 243, 248–50, 578 A.2d 816 (1990).

Officer Shaffer had probable cause to believe that the appellee had committed both traffic violations. The Fourth Amendment propriety of the initial traffic stop was, therefore, unassailable. *State v. Green,* 375 Md. 595, 609–10, 826 A.2d 486 (2003); *Rowe v. State,* 363 Md. 424, 433–34, 769 A.2d 879 (2001); *Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491 (1999); *Larocca v. State,* 164 Md.App. 460, 487–89, 883 A.2d 986 (2005); *Muse v. State,* 146 Md.App. 395, 405–06, 807 A.2d 113 (2002). As long as, objectively speaking, the officer had probable cause for the traffic stop, it is immaterial if, subjectively speaking, he had some other purpose in mind. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The appellee, indeed, does not contest the Fourth Amendment reasonableness of the initial traffic stop. The legality of the beginning of the appellee's detention is firmly established.

### Pinpointing the Onset of Detention

Pinpointing the precise beginning of the detention on the clock is a bit more problematic. The hearing judge made no findings of fact. The appellee himself did not testify, nor did his passenger. Officer Shaffer was the only witness to the initial detention who did testify, and he could only give an approximation. The time that he was asked about, moreover, was not the ultimate stopping of the appellee but rather his initial observation of the appellee.

Q. *And did there come a time when you observed a black Cadillac* during your shift?

A. Yes, there was. *At about 12:20 in the afternoon.*

Q. And where were you when you observed this vehicle?

A. On Hechingers Drive, which is off of Maryland 197 near 7–Eleven.

(Emphasis supplied).

It was after that initial observation that Officer Shaffer subsequently saw the Cadillac make the left-turn violation onto Route 197. At that point, the officer activated his emergency equipment and followed the Cadillac for "about a quarter of a mile" until it came to a stop at the intersection of Route 197 and Cherry Lane. Counsel for both the appellee and the State apparently had dispatch records available to them, however, although those records were not introduced into evidence at the hearing. In any event, in closing argument before the hearing judge, counsel for both the State and the appellee placed the commencement of the actual detention at precisely 12:23 p.m. That is good enough for us. The lapse of time that we shall assess in this case, therefore, has a precise starting time of 12:23 p.m.

### The K–9 "Alert": The Clock Stops

At the other end of the time continuum, once the K–9 "alerted" to the probable presence of contraband drugs in the Cadillac, all Fourth Amendment uncertainty came to an end. Officer Shaffer and Officer Brooks had, by virtue of the K–9 "alert," unquestionable probable cause for a warrantless *Carroll*–Doctrine search of the Cadillac, which they then proceeded to execute. To the extent to which it might be material, they also had unquestionable probable cause for the warrantless arrest of the appellee as the driver of the Cadillac (not to mention the arrest of his passenger).

Albeit discussing a dog-sniff of luggage rather than a dog-sniff of an automobile, the Supreme Court in *Florida v. Royer,* 460 U.S. 491, 505–06, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983),

expressly approved both the legitimacy and the probable-cause-generating significance of a canine "alert."

> The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage. There is no indication here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out. Indeed, it may be that no detention at all would have been necessary. A negative result would have freed Royer in short order; *a positive result would have resulted in his justifiable arrest on probable cause.*

(Emphasis supplied). There is no meaningful distinction between the canine ability to smell what is inside a suitcase and to smell what is inside an automobile.

Judge Cathell placed the imprimatur of the Court of Appeals on the probable-cause-generating effect of a canine "alert" on an automobile in *Wilkes v. State,* 364 Md. 554, 586, 774 A.2d 420 (2001):

> The troopers were able to conduct a lawful search of petitioner's vehicle because *after the K–9 scan alerted to the presence of narcotics they had probable cause to do so.* We have noted that *once a drug dog has alerted a trooper "to the presence of illegal drugs in a vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle]."*

(Emphasis supplied).

*Gadson v. State,* 341 Md. 1, 8, 668 A.2d 22 (1995), had, indeed, foreshadowed the *Wilkes* holding by six years.

> Nor does Gadson dispute that *once Sandy the dog alerted* Trooper Prince to the presence of illegal drugs in the vehicle, *sufficient probable cause existed to support a warrantless search of the truck. See United States v. Dovali–Avila,* 895 F.2d 206, 207 (5th Cir.1990) (*a "dog alert" is*

*sufficient to create probable cause to conduct a warrantless vehicle search* ).

(Emphasis supplied).

In *Fitzgerald v. State,* 153 Md.App. 601, 619, 837 A.2d 989 (2003), *aff'd,* 384 Md. 484, 864 A.2d 1006 (2004), our holding was unequivocal.

As we affirm the adequacy of the warrant application, we hold that *Alex's "alert" to Apartment A was ipso facto enough to establish probable cause. Both the Court of Appeals and this Court have regularly affirmed the dispositive sufficiency of a canine "alert."*

(Emphasis supplied).

This Court was equally emphatic in *Carter v. State,* 143 Md.App. 670, 674, 795 A.2d 790 (2002):

The dog scanned the vehicle and "alerted" to the presence of drugs.

From that point on, there is no question about the Fourth Amendment proprieties. *The dog "alert" supplied the probable cause for a warrantless search of the van.*

(Emphasis supplied).

We similarly stated in *State v. Funkhouser,* 140 Md.App. 696, 711, 782 A.2d 387 (2001):

*When a qualified dog signals to its handler* that narcotics are in a vehicle, ... *that is ipso facto probable cause to justify a warrantless Carroll Doctrine search of the vehicle.*

(Emphasis supplied). See also *Timmons v. State,* 114 Md. App. 410, 417, 690 A.2d 530 (1997); *Gadson v. State,* 102 Md.App. 554, 556, 650 A.2d 1354 (1994), *rev'd on other grounds,* 341 Md. 1, 668 A.2d 22 (1995) ("That the 'alert' to the presence of narcotics by a trained and certified drug-sniffing canine is ample to establish probable cause is well established law."); *In Re Montrail M.,* 87 Md.App. 420, 437, 589 A.2d 1318 (1991), *aff'd,* 325 Md. 527, 601 A.2d 1102 (1992) ("The dog's reaction properly served as probable cause to search the vehicle."); *Snow v. State,* 84 Md.App. 243, 248, 578 A.2d 816 (1990) ("We agree with the State that, if Paros properly and

constitutionally conducted the scan or sniff of the perimeter of the car using his trained dog, the dog's responses could be held to provide probable cause to search the interior of the car."). And cf. *Grant v. State,* 55 Md.App. 1, 14–15, 461 A.2d 524 (1983).

In *State v. Cabral,* 159 Md.App. 354, 859 A.2d 285 (2004), a suppression hearing judge excluded the evidence on several grounds, one of which was that a trained dog's olfactory sensitivity may be too good and that gives rise to the risk that the dog may have "alerted" to drugs that were once present but are no longer present in the car. In reversing that suppression ruling and upholding the State's appeal, Judge Hollander's opinion reaffirmed the probable-cause-generating value of the K–9 sniff.

These cases lead us to conclude that Cabral is "barking up the wrong tree." *He has confused probable cause with proof beyond a reasonable doubt.* If a trained drug dog has the ability to detect the presence of drugs that are no longer physically present in the vehicle or container, but were present perhaps as long as 72 hours prior to the alert, *such an ability serves to strengthen the argument that the dog has a superior sense of smell on which to rely to support a finding of probable cause.* The possibility that the contraband may no longer be present in the vehicle does not compel the finding that there is no probable cause; *for purposes of the probable cause analysis, we are concerned with probability, not certainty.*

159 Md.App. at 380–81, 859 A.2d 285 (emphasis supplied).

### Pinpointing the K–9 Alert

After initially confronting the appellee, Officer Shaffer returned to his patrol car to talk to his dispatcher. He stated that it was "at approximately 12:28 or 12:30 p.m." that he radioed a request for a K–9 unit to come to the scene. The only other witness to testify was Officer Brooks. He also placed the time that the call for K–9 assistance came in as 12:30 p.m.

Q. Do you recall what time you received this phone call?

A. Approximately 12:30 p.m.

With both versions of the timing of the call for assistance placing it at 12:28 p.m. or 12:30 p.m., we will accept that range of time as controlling. It does not appear that either version makes the appellee's argument better or worse. The call for the K–9 is thus established as coming five or seven minutes after the detention began at 12:23 p.m.

The next temporal landmark is that of when the K–9 unit arrived at the roadside location. Officer Shaffer's estimate was that the K–9 unit responded within 10 or 12 minutes of the placing of the request.

*[D]o you recall the length of time from the time that you left the Defendant's window to the time that the K–9 Officer arrived,* do you know what time-what that time frame was?

A. *I believe it was about ten to twelve minutes.*

(Emphasis supplied).

Officer Brooks was emphatic that he responded within 10 minutes of receiving the call, to wit, by 12:40 p.m.

Q. And do you recall from the point that you received the call, you said at 12:30, *what time did you actually get to Cherry Lane?*

A. *It was ten minutes later, 12:40.*

(Emphasis supplied).

On cross-examination, counsel, apparently with a dispatch record in hand or mind, unsuccessfully sought to shake Officer Brooks's testimony as to his arrival time.

Q. Officer Brooks, you indicated on Direct Examination that *you got to the scene at around what time?*

A. *12:40.*

Q. *Was it more like 12:47?*

A. *No, it was not.*

Q. *Are you sure about that?*

A. *Yes, I am.*

(Emphasis supplied).

Examined about an apparent discrepancy between the dispatch record and his own recollection, Officer Brooks remained steadfast.

Q. This is a record kept in the ordinary course of business; correct?

A. *That's the record the dispatcher does, not me. I do my own times* based on when I arrive. *I can't speak to what they do.*

(Emphasis supplied).

The so-called "record kept in the ordinary course of business" was never offered in evidence. Officer Brooks's testimony placed his arrival at 12:40 p.m. On the other hand, Officer Shaffer's estimation was between 12:40 and 12:42 p.m. We must accept as binding on us, therefore, 12:42 p.m. for the arrival of the K–9 unit. That version is, by two minutes, better from the appellee's point of view.

The terminal time for our Fourth Amendment appraisal, however, is not when the K–9 unit arrived on the scene, but the time when the actual K–9 "alert" was made. After arriving at 12:42 p.m., Officer Brooks described his procedure.

Q. And when you got there, what did you do?

A. Initially *spoke with Officer Shaffer* as to what he had, what he wanted from me. And at that point *got my dog out of the car* and prepared him for the scan, *and at that point,* go ahead and *scanned the vehicle.*

(Emphasis supplied).

He further described the time lapse between his arrival and the K–9 "alert" as "less than five minutes."

Q. And from the time that you arrived on the scene, you said that you arrived on the scene at 12:40 p.m., *to the time that your K–9 partner made the first indication, or the hit, how much time had elapsed from the time you arrived* to the time that she hit—or he hit, excuse me?

A. *It would have been less than five minutes.*

(Emphasis supplied).

For our appraisal purposes then, we have a traffic-based detention that began at 12:23 p.m.; a call for a K–9 unit within seven minutes, to wit, by 12:30 p.m.; the arrival of the K–9 unit by 12:42 p.m., or 19 minutes after the detention began; and the ultimate K–9 alert at shortly before 12:47 p.m., or just less than 24 minutes after the initial detention began. We will round off the time lapse before us for examination as one of 24 minutes.

### A Tempest In a Teapot: The Appellee's Arrest Does Not Concern Us

Whatever may have happened after 12:47 p.m. on October 27, 2005 in terms of the appellee's arrest is utterly immaterial to the outcome of this appeal. Following the positive K–9 "alert," the appellee and his passenger were ordered out of the car so that the *Carroll* Doctrine search of the vehicle could begin. As the appellee brought out on cross-examination of Officer Shaffer, when he and his passenger were removed from the car, they were handcuffed. They were frisked for weapons and, by some modality or other, money was taken out of their pockets and placed on the hood of the Cadillac. Car keys were also taken from the appellee, who was then, along with the passenger, forced to sit on the sidewalk for the duration of the vehicle search.

After the vehicle search produced the drugs and the handguns, the appellee and his passenger were, according to Officer Shaffer and according to the State's present argument, formally arrested. The appellee, on the other hand, contends that he was actually arrested immediately after he was removed from his vehicle and before the *Carroll* Doctrine search took place. His counsel argued to the hearing judge.

[A]t that point, Your Honor, my client is handcuffed. He has been searched. He has had his keys taken from him. He's made to sit on the sidewalk. A reasonable person in

that situation, Your Honor, would believe that they're under arrest.

On that point, the appellee is absolutely correct. Of course he was arrested. The State's argument that he had not been arrested is ridiculous. If the appellee had not been arrested, Officer Shaffer might have been permitted to pat down the exterior of his clothing surface as part of a *Terry*-frisk but, barring the palpable feel of a weapon in the course of that frisk, that would have been the full scope of permissible police activity. You don't go into pockets and retrieve keys and money unless you are conducting a full-blown search incident to lawful arrest. There is no such thing as a full-blown search of a person, in contrast to a limited pat-down of the exterior of the clothing, as an incident to a *Terry*-stop. There is no such thing as a full-blown search of a person incident to what the State calls an investigative detention. The State does not even attempt to suggest how a "frisk" for weapons produced the money that was inside the appellee's pockets. Did a wad of money feel like a gun? Does the State even have a theory?

■ We fully agree with the appellee that he was arrested immediately after he was ordered to alight from his vehicle. The problem with the appellee's argument in this regard is that it does not get him anywhere. To be sure, he was arrested, but he was **validly** arrested based on the probable cause produced by the K–9 "alert." The validity of his arrest did not need to abide the results of the vehicle search. What that search revealed only confirmed the pre-existent and fully efficacious probable cause that had already arisen from the K–9 "alert." Already having probable cause, the police did not need to wait until they had "probable cause plus."

The outcome of the trial on the merits (at which guilt must be proved beyond a reasonable doubt) would, of course, have been another matter, but the State would be on the same solid ground on this appeal of a pretrial suppression ruling if, following the K–9 "alert," the police had simply packed up and gone home without conducting any follow-up *Carroll* Doctrine vehicle search. The only thing that would have been lacking

would have been some evidence to suppress. In terms of pure Fourth Amendment justification, however, the State already had everything it needed.

Indeed, we only discuss this matter because the large amount of U.S. currency recovered from the person of the appellee was presumably going to be evidence at the appellee's trial and was presumably part of the subject matter of the suppression motion. Because the search that produced it was incident to a lawful arrest in either event, it makes no difference whether it was a lawful arrest before the *Carroll* Doctrine search or a lawful arrest that followed the *Carroll* Doctrine search.

### The K–9 "Alert" And Probable Cause to Arrest

The appellee, however, vigorously maintains that the K–9 "alert" on the appellee's vehicle did not give the police probable cause to arrest the appellee. The linchpin of the appellee's argument in this regard is:

> In *Fitzgerald v. State,* 153 Md.App. 601, 620, 837 A.2d 989 (2003), aff'd, 384 Md. 484, 864 A.2d 1006 (2004), this Court declined to rule that the positive alert by a drug dog amounts to probable cause to arrest the driver of the vehicle.

That characterization of what we did in *Fitzgerald* does surprise us. What we actually said was:

> The same degree of certainty that will support the warrantless *Carroll* Doctrine search of an automobile will, *ipso facto,* support the warrantless arrest of a suspect.

153 Md.App. at 620, 837 A.2d 989. We thought that what we there said meant that, in circumstances such as those involving a K–9 sniff, probable cause to search the vehicle is, *ipso facto,* probable cause to arrest, at the very least, the driver. If any further clarification is necessary, that is, indeed, what we meant.

The Supreme Court's decision in *Maryland v. Pringle,* 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), is absolutely dispositive. Because of the close association between contra-

band in a vehicle and the driver of (or other passenger in) the vehicle, either finding the drugs in the vehicle, as in *Pringle,* or probable cause to believe that they are in the vehicle, as in this case, necessarily implicates the driver and passengers. Whatever the level of certainty we have reached with respect to the presence of contraband itself, its association with the occupants of the vehicle is the same. In terms of that inculpatory association, the Supreme Court's unanimous opinion observed:

> We think it *an entirely reasonable inference* from these facts *that any or all three of the occupants had* knowledge of, and exercised *dominion and control over, the cocaine. Thus,* a reasonable officer could conclude that *there was probable cause to believe Pringle committed the crime of possession* of cocaine, either solely or jointly.

540 U.S. at 372, 124 S.Ct. 795 (emphasis supplied).

In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court, as part of a hypothetical discussion, stated that a positive K–9 "alert" on a suspect's luggage would amount to probable cause for the suspect's arrest.

> A positive result [from the canine sniff] would have resulted in his justifiable arrest on probable cause.

460 U.S. at 506, 103 S.Ct. 1319.

In *Ricks v. State,* 322 Md. 183, 586 A.2d 740 (1991), the Court of Appeals similarly concluded that a positive "alert" on a suspect's luggage was not only probable cause to search the luggage but, *ipso facto,* probable cause to arrest the possessor of the luggage.

> *Ricks does not contest* the intermediate appellate court's determination, which affirmed the trial court's denial of the motion to suppress, *that his arrest was supported by the requisite probable cause.* Indeed, at oral argument before us, Ricks conceded that *he was lawfully arrested,* at least *at*

*the point when the dog scratched his bag, indicating that it contained narcotics.*

322 Md. at 188, 586 A.2d 740 (emphasis supplied).

In *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001), Judge Cathell, after stating that a canine "alert" had supplied probable cause to justify a warrantless automobile search, surmised that it might *ipso facto* support a warrantless arrest as well:

Moreover, *some jurisdictions have held that once a drug dog has alerted* the trooper to the presence of illegal drugs in a vehicle, *sufficient probable cause existed to support a warrantless arrest.*

364 Md. at 587 n. 24, 774 A.2d 420 (emphasis supplied).

He cited, with implicit approval, three cases from the federal circuit courts. *United States v. Klinginsmith,* 25 F.3d 1507, 1510 (10th Cir.1994), had no difficulty reaching this conclusion:

*[W]hen the canine "alerted"* to the vehicle, the district court held that *the officers had probable cause to arrest the defendants* and effect an immediate search under the automobile exception to the search warrant requirement.

We agree completely with the district court's analysis of this matter.... *[W]hen the dog "alerted," there was probable cause to arrest Magee and Klinginsmith.*

(Emphasis supplied). *United States v. Williams,* 726 F.2d 661, 663 (10th Cir.1984), reached the same conclusion:

Defendant's argument that probable cause for his arrest did not exist because the ticket agent lacked training in the drug courier profile fails because defendant ignores that *a drug sniffing dog's detection of contraband in luggage "itself establish[es] probable cause, enough for the arrest,* more than enough for the stop."

(Emphasis supplied).

The United States Court of Appeals for the Second Circuit held to the same effect in *United States v. Waltzer,* 682 F.2d 370 (2d Cir.1982). Waltzer was traveling from Fort Lauderdale, Florida, to New York City. A trained canine, "Kane," alerted on two pieces of luggage upon its arrival at Kennedy

Airport. When Waltzer retrieved the luggage from the baggage carousel, he was immediately arrested. The Second Circuit held that probable cause had been shown to justify the warrantless arrest.

*We regard the dog's designation of the luggage as itself establishing probable cause, enough for the arrest* ....

Canine identification is a non-intrusive, discriminating and, in cases such as Kane, reliable method of identifying packages containing narcotics.... *Where designation by a dog* with a record of accuracy *occurs,* therefore, *we hold that probable cause has been established as to the person possessing the luggage.*

682 F.2d at 372–73 (emphasis supplied).

*United States v. Garcia,* 52 F.Supp.2d 1239 (D.Kan.1999), also lends strong support for our conclusion in this regard. On a rural Kansas highway two vehicles, traveling in apparent convoy, were stopped for speeding violations. After a trained canine finally arrived at the scene and made a pertinent "alert" on both vehicles, the occupants of both vehicles were arrested. With respect to the constitutionality of the warrantless arrests, the court concluded:

Even in the absence of the other information known by the troopers, *once the drug dog alerted on the two vehicles, the troopers had probable cause to arrest Garcia and the other occupants of the two vehicles.*

52 F.Supp.2d at 1253 (emphasis supplied).

We are not unaware of *State v. Wallace,* 372 Md. 137, 812 A.2d 291 (2002), in which the Court of Appeals held that a K–9 "alert" on an automobile did not constitute probable cause to search a mere passenger, who was but one of five occupants of the vehicle. The vitality of *State v. Wallace* is somewhat suspect in view of its heavy reliance on the earlier Court of Appeals decision in *Pringle v. State,* 370 Md. 525, 805 A.2d 1016 (2002), which was subsequently reversed by the Supreme Court's decision in *Maryland v. Pringle, supra.* Quite aside from that possible invalidation, however, the *Wallace* decision

itself clearly drew a distinction between a mere passenger in an automobile and the driver of the vehicle.

> *A passenger in an automobile is generally not perceived to have the kind of control over the contents of the vehicle as does a driver* and cases from this State have noted *the distinction between drivers* and owners *and passengers* of vehicles. Therefore, *some additional* substantive *nexus* between the passenger and the criminal conduct *must appear to exist* in order *for an officer to have probable cause to* either search or *arrest a passenger.*

372 Md. at 158–59, 812 A.2d 291 (emphasis supplied). In this case, of course, the appellee was the driver of the vehicle, a person with a more significant connection to the car, a matter not addressed by *Wallace.*

In any event, we are applying the law as we laid it down in *State v. Funkhouser,* 140 Md.App. 696, 721, 782 A.2d 387 (2001):

> *The probable cause developed by the initial canine "alert" was* at one and the same time *probable cause to believe* both 1) that drugs were probably then in the car and 2) *that its driver* and sole occupant *probably was then or recently had been in unlawful possession of those drugs.*

(Emphasis supplied). The fact that the appellee here was not the "sole occupant," but only one of two, does not alter the result.

The similarity between probable cause for a *Carroll* Doctrine search and probable cause for an arrest was analyzed by the *Funkhouser* opinion.

> The legal conclusions to which probable cause points are, albeit frequently related, slightly different in the cases of a warrantless automobile search and a warrantless arrest. One concerns a crime by a person; the other concerns evidence in a place. *The factual predicate for those respective conclusions was,* however, *identical in this particular case.*
>
> In terms of quantifiable probability, moreover, *the probable cause for a Carroll Doctrine search is the same as the*

*probable cause for a warrantless arrest.* ... It does not take more probable cause to support a warrantless arrest than it does to support a warrantless automobile search. The classic *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) definition of probable cause is used for both conclusions alike, with *no distinction made between the predicate for an automobile search and the predicate for a lawful arrest. Although the closely related predicates may sometimes differ slightly in terms of qualitative content or substance, they do not differ quantitatively in terms of degree of their probability. The measure of likelihood is the same.*

*Id.* (emphasis supplied).

The identity of the probable cause focused on the car and on its driver in *Funkhouser* was indistinguishable from that same identity of probable cause in the case now before us.

*[T]he canine "alert" could have provided,* all else being assumed to have been constitutional, a double *justification for two related but separate and distinct Fourth Amendment events.* The police not only had *probable cause to search the Jeep* Wrangler; they also had *probable cause to arrest Funkhouser as its driver.*

*Id.* (emphasis supplied).

### One Detention or Two?

At this point, our focus reverts to the 24–minute period of detention between the initiation of the traffic stop and the K–9 "alert." We cannot even begin to analyze the reasonableness of a detention, however, until we know its purpose. It is the traffic stop that typically poses the problem in terms of its prolongation. The familiar pattern is one in which, pursuant to *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), an objectively justifiable stop for a traffic violation furnishes a target of opportunity for a subjectively desired narcotics investigation. The investigative instrumentality is frequently a drug-sniffing canine.

There is ambivalence in how we handle *Whren.* Although the law indulges this almost routine instance of investigative opportunism, it nonetheless maintains a healthy skepticism, as it both tolerates but simultaneously seeks to minimize the degree of exploitation. There is with respect to *Whren* an ongoing tug-of-war in which the equities are not unmixed. Using a dog is accepted as a perfectly legitimate utilization of a free investigative bonus as long as the traffic stop is still genuinely in progress. The emphasis in that statement is on the word "genuinely." *In re Montrail M.,* 87 Md.App. 420, 437, 589 A.2d 1318 (1991) ("Only one detention occurred in the case *sub judice.* The trained dog arrived on the scene while Deputy Owens was still running a check on Matio C.'s license and registration, and the scan took place as the deputy completed the check."). In a delicate balance of competing interests, the basic restraint that the courts attempt to impose on the police is one aimed at insuring that traffic stops are not unduly prolonged simply to allow more time for the K–9 unit to arrive on the scene.

### A Traffic Stop Standing Alone

■ One scenario, and one big chunk of the caselaw, is that in which the traffic stop provides the only justification for any Fourth Amendment detention. How long may it last, while the dog is on the way? The basic rule is easy to articulate. Once the traffic-related purpose of the stop has been served, any detention based on the traffic stop should terminate and the stopee should be permitted to leave the scene immediately. Once a traffic stop is over, there is no waiting for the arrival, even the imminent arrival, of the K–9 unit. *Charity v. State,* 132 Md.App. 598, 614–15, 753 A.2d 556 (2000), spoke to this situation.

*Just as a traffic stop,* be it a *"Whren* stop" or be it subjectively genuine, *loses its energizing power* to legitimate a contemporaneous but extrinsic investigation *once it is formally terminated, Ferris v. State, so too may the legitimating raison d'etre evaporate if its pursuit is unreasonably attenuated or allowed to lapse into a state of*

*suspended animation.* We are not suggesting for a moment that when the police effectuate a traffic stop, they are operating under a "time gun" or may not pursue two purposes essentially simultaneously, with each pursuit necessarily slowing down the other to some modest extent. We are simply saying that *the purpose of the justifying traffic stop may not be conveniently or cynically forgotten* and not taken up again until after an intervening narcotics investigation has been completed or has run a substantial course. *The legitimating power of a traffic stop* to justify a coincidental investigation *has a finite "shelf life," even when the traffic stop,* as in this case, *is not formally terminated.*

(Emphasis supplied). *Charity,* 132 Md.App. at 611, 753 A.2d 556, put the limitation on the duration of a stop in a nutshell:

Once the purpose of a traffic stop has been fully and finally served, the traffic stop may not supply the Fourth Amendment justification for any further intrusion that follows.

In *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999), Judge Raker made it clear that once the purpose of the traffic stop has been fully accomplished, that rationale for the detention is at an end and any further or second detention will only be permitted if it has an independent justification.

*[T]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway,* and ordinarily to investigate the manner of driving *with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention.*

355 Md. at 372, 735 A.2d 491 (emphasis supplied).

*Gadson v. State,* 341 Md. 1, 16, 668 A.2d 22 (1995), held, in the context of a stop at a checkpoint, that once the initial purpose of the stop has been served, it may not be prolonged absent a fresh Fourth Amendment justification for prolonging it.

We believe this reasoning applies here. Trooper Prince testified, and the State concedes, that the purpose of detaining Gadson at the guard shack was to prevent drugs from

entering the House of Correction. *Once Gadson agreed to turn back a quarter mile from the prison, that goal was fulfilled. Continued detention of Gadson would have been justified only if Trooper Prince had "reasonable, articulable suspicion" that there were drugs in Gadson's truck.* The State does not contend that Trooper Prince possessed any basis for such suspicion, and none appears on the record. Therefore, we hold the detention was unreasonable.

(Emphasis supplied).

In *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990), the defendant's automobile was stopped for a speeding violation. Although the police obviously suspected a violation of the drug laws, they were never able to establish *Terry*-level articulable suspicion to detain the car pending a dog-sniff. The detection, therefore, had to rise or fall on the predicate of the traffic stop alone. The State argued that because the traffic stop was brief, it thereby did not offend the Fourth Amendment.

The State, however, also justifies the detention of Snow's vehicle on the basis that *the total time that elapsed between the stop and the completion of the scan did not exceed the normal time for processing papers during a traffic stop.* The judge who heard the motion to suppress used this same rationale to support his denial of the motion.

84 Md.App. at 264, 578 A.2d 816 (emphasis supplied).

We held that the reasonableness of a traffic-based detention is not measured by the clock alone. Even a brief detention may offend the Fourth Amendment if it lasted longer than was necessary; not in the average case, but in that particular case.

*The intrusion* permitted *"must* be temporary and *last no longer than is necessary to effectuate the purpose of the stop."* Here, the purpose of the stop was to warn or issue a ticket to Snow for speeding. *That purpose was fully fulfilled, but the detention was continued.*

*Id.* at 264–65, 578 A.2d 816 (emphasis supplied). A very long stop may pass muster and a very short stop may not.

The *Snow* decision also pointed out that the use of a drug-sniffing canine, an effective investigative tool if the police can squeeze it in before the buzzer sounds, does not serve any traffic-related purpose and will not justify any extension of a traffic stop.

> The purpose of the stop ... was *to enforce the highway speed limits,* whereas the purpose of the "dog sniff" was *to detect drugs. These two purposes are not related to one another.*

*Id.* at 263, 578 A.2d 816 (emphasis supplied).

In *Munafo v. State,* 105 Md.App. 662, 660 A.2d 1068 (1995), the police also suspected drug involvement and wanted to detain the defendant's car at curbside long enough for a K–9 scan of the car to be executed. They did not have an independent *Terry* basis for a drug-related detention, however, and were totally dependent on the traffic stop as their sole justification for detaining the defendant at the scene. Judge Davis's opinion held that a deliberate delay in the processing of the traffic stop in order to facilitate the timely arrival of the K–9 unit was a violation of the Fourth Amendment.

> Even the brief detention of a vehicle and its occupant(s) must be justified by a reasonable suspicion.
>
> In the present case, *the original traffic stop was justified solely by appellant's speeding and reckless driving.* Once Deputy Houck learned that appellant's license and registration were in order, he was required to end the stop promptly and send appellant on his way. Instead, he *waited two to three minutes for Sergeant Elliott to arrive, and spent an additional minute or two discussing the situation with Sergeant Elliott* before the two officers approached the car together. Although the delay was brief, it was entirely unjustified by the purpose of the original stop.

105 Md.App. at 673, 660 A.2d 1068 (emphasis supplied). And see *Whitehead v. State,* 116 Md.App. 497, 698 A.2d 1115 (1997).

In *Graham v. State,* 119 Md.App. 444, 705 A.2d 82 (1998), an automobile passenger, following a valid traffic stop of the

automobile for speeding, was detained for a period of 25 minutes while a K–9 unit responded to the scene. Judge Davis's opinion pointed out that the purpose of the traffic stop had long since been fully effectuated.

> *At the point in time when Davis was arrested, the purpose of the traffic stop had been effectuated.* In other words, approximately five minutes, more or less, after the initial stop, Trooper Kissner had concluded his official duties with respect to the traffic stop. . . .

119 Md.App. at 468, 705 A.2d 82 (emphasis supplied). A traffic stop must not be prolonged to facilitate the arrival of a K–9 unit.

> In the case presently before us, *the prolongation of a detention because the K–9 unit is detained elsewhere must be viewed as contrary to* the diligence required under *a Fourth Amendment reasonableness analysis.*

*Id.* (emphasis supplied).

In *Pryor v. State,* 122 Md.App. 671, 716 A.2d 338 (1998), Chief Judge Murphy recognized the practical utility to the police of a *Whren* stop, but reminded us that when such an opportunity is seized, we must "examine an important rule of engagement applicable to the forcible stop of a motorist who commits a minor traffic violation while under police surveillance." 122 Md.App. at 674, 716 A.2d 338. The defendant in *Pryor* was under investigation for narcotics violations when he was foolish enough to drive at a speed of 45 miles per hour in a 25 mile-per-hour zone. The plain-clothes detective, spotting an opening, called in a uniformed officer to make a traffic stop. Judge Murphy's opinion acknowledged the practical utility of such police opportunism.

> In *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court held that *the Fourth Amendment does not prohibit a law enforcement officer who observes a traffic violation from stopping the motorist* who committed that violation, *even though the true reason for the stop is the officer's interest in investigating whether the motorist is involved in other criminal activity.* Forc-

ible traffic stops recognized as proper by that decision have become known as *Whren* stops.

122 Md.App. at 674–75 n. 1, 716 A.2d 338 (emphasis supplied).

The *Pryor* opinion then admonished that the "rule of engagement," however, only gives the police a narrow window through which to exploit such a *Whren*-based opportunity.

[U]nless continued detention can be justified by what occurs during the brief period of time it takes to determine whether the motorist has a valid license and whether the vehicle has been reported stolen, *a motorist who is subjected to a "Whren stop" for a minor traffic violation cannot be detained at the scene of the stop longer than it takes*—or reasonably should take—*to issue a citation for the traffic violation* that the motorist committed.

*Id.* at 674–75, 716 A.2d 338 (emphasis supplied). *Whren* presents the police with an unusual opportunity, but they are required to seize it with diligence. The circuit court found that immediately after the initial stop the officer called for a K–9 unit, but that between 20 and 25 minutes elapsed before the K–9 unit arrived and "alerted" on the car. Judge Murphy's analysis pointed out:

Under *Whren, the law enforcement officer who observes a traffic violation may stop the violator, even though the officer does so* out of curiosity as to whether (or *in the hope that) the stop will lead to* the discovery of *other incriminating evidence. . . .*

*The right to make a forcible stop does not justify a subsequent unreasonable detention.*

*Id.* at 679–80, 716 A.2d 338 (emphasis supplied).

This Court held that the initial stop did not "justi[fy] a detention that extended beyond the period of time that it would reasonably have taken for a uniformed officer to go through the procedure involved in issuing a citation to a motorist." *Id.* at 682, 716 A.2d 338. By contrast, *In re Montrail M.,* 87 Md.App. at 437, 589 A.2d 1318, was a case in which the traffic stop was still legitimately being processed

when the K–9 unit arrived on the scene and "alerted" on the car.

Only one detention occurred in the case *sub judice*. *The trained dog arrived on the scene while Deputy Owens was still running a check on Matio C.'s license* and registration, and *the scan took place as the deputy completed the check.* (Emphasis supplied). And see *McKoy v. State*, 127 Md.App. 89, 101, 732 A.2d 312 (1999).

*Wilkes v. State*, 364 Md. at 570, 774 A.2d 420, also was a case in which a K–9 unit arrived at the scene and made a timely "alert" while an initial traffic stop remained fully operational.

The record establishes that the traffic stop was not so extended. *The K–9 unit arrived on the scene and conducted the scan of petitioner's Escort prior to Trooper Graham receiving radio verification of the validity of petitioner's driver's license,* vehicle registration card, and warrants check. *The traffic stop was ongoing at the time the K–9 scan was employed.* At the suppression hearing, there was no evidence that the police extended or delayed the traffic stop beyond the time necessary to reasonably complete the actions needed to resolve the initial purpose for the stop. A reasonable inference from the evidence in the record is that *the K–9 scan occurred while the initial reason for the traffic stop was still being investigated.*

(Emphasis supplied).

*Byndloss v. State*, 391 Md. 462, 893 A.2d 1119 (2006), may be the case that pushes the legitimate prolongation of a traffic stop to its theoretical limits. The motorist in that case was initially stopped on I–95 because a plastic border around her license tag partially obscured the registration date in an upper corner. Because of a series of unusual computer problems at nearby police barracks, the stop was prolonged even after the stopping officer had finished writing "a warning for the license plate cover."

Sergeant Hughes then decided to hold off on giving Ms. Malone the written warning because he had not yet been

able to run the licenses and registration through MILES and NCIC.

391 Md. at 470, 893 A.2d 1119.

The effort to finish the checking of the record was still going on, 30 minutes after the initial stop, when the K-9 unit arrived and "alerted" on the car. The Court of Appeals placed its imprimatur on the duration of the traffic stop.

We find that under the particular facts and circumstances of this case, *the initial traffic stop was still ongoing at the time of the K-9 scan and resultant alert.* The facts indicate that Sergeant Hughes exercised reasonable diligence under the circumstances, in obtaining the license, registration, and warrant information from MILES and NCIC and *there was no evidence* extant *that the stop was extended beyond the time necessary* to reasonably complete all of the actions associated with resolving the initial purpose of the stop.

*Id.* at 479, 893 A.2d 1119 (emphasis supplied).

The State, in relying heavily on *Byndloss v. State,* ignores the procedurally dramatic difference between that case and this. The Court of Appeals made its *de novo* independent constitutional conclusion in that case on the basis of the version of the evidence most favorable to the State, the prevailing party below. We, by contrast, must make our independent constitutional conclusion on the basis of the version of the evidence most favorable to the defendant. With that overarching difference in mind, there is no similarity in the respective sets of evidence being reviewed. It is quite conceivable that on the identical record in the *Byndloss* case, we ourselves could reach two diametrically opposite conclusions, dependent entirely on which of the parties had been the prevailing party at the suppression hearing and which version of the facts we, therefore, accepted as true.[1]

---

1. Analogizing the facts of one case to those of another can be a vexingly misleading practice. That a set of facts is enough to support a trial judge's ruling in the precedential case by no means suggests that the same precise set of facts would compel reversing the ruling, had it gone in the opposite direction. Comparing the facts of one case to those of

If we were simply doing a color matching test, comparing the length of the detention in this case with other detention samples, good and bad, we could easily find good matches going in either direction. What is involved, however, is more than a mere temporal comparison. As this Court pointed out in *Charity v. State*, 132 Md.App. at 617, 753 A.2d 556:

> *Even a very lengthy detention may be completely reasonable* under certain circumstances. Conversely, *even a very brief detention may be unreasonable* under other circumstances. There is no set formula for measuring in the abstract what should be the reasonable duration of a traffic stop. *We must assess the reasonableness of each detention on a case-by-case basis and not by the running of the clock.*

(Emphasis supplied).

### The Traffic Stop Exceeded Its Limits

■ If, *arguendo,* the detention necessary for the processing of the traffic violation were the only Fourth Amendment basis on which the K–9 "alert" in this case could rest, we would affirm the decision of the hearing judge that the length of the detention was unreasonable.

The 24–minute period of delay was not, in and of itself, especially inordinate, particularly in light of *Byndloss v. State* (30 minutes was not unreasonable). But see *Pryor v. State* (20 to 25 minutes was unreasonable). The time period in this case was on the cusp, and the call with respect to it could readily have gone either way. Critical to the question as to which way that call should go was the behavior of Officer Shaffer. If he was acting diligently in processing the traffic stop, the length of the detention was reasonable. If, on the other hand, he was deliberately stalling so that the K–9 unit could arrive before he sent the appellee on his way, the length of the detention was thereby unreasonable. What was in Officer Shaffer's mind was a quintessential question of fact.

---

another is meaningless unless the cases are in similar procedural postures.

Office Shaffer insisted that he could not properly let someone go until that person had been correctly identified.

Q.... And, so, your tickets are finished, but the dispatcher is still working on something other than the tickets; right?

A. That is correct. And *I would be remiss to let someone go on a citation who I have not correctly identified.* (Emphasis supplied). Defense counsel very forcefully argued, however, that there was nothing that Officer Shaffer could get over the air waves from his dispatcher that could have helped him to make an accurate identification of the appellee, and that the delay was clearly nothing but a stalling tactic to get the K–9 unit on the scene before the bell rang.

The existence of either of those purported purposes or motivations was a plausible inference that could fairly have been drawn from the evidence. The hearing judge made no finding of fact and there is, therefore, no fact-finding to which we need defer. The hearing judge did, however, make a ruling, and that gives us a prevailing party. That is all we need to resolve the issue.

The State poses its primary contention: "Was an approximately 25 minute detention of Ofori during a valid traffic stop reasonable when the purpose of the stop had not yet been completed?" The answer to that contention, of course, is ridiculously simple. If we accept the State's version of what happened, it was unquestionably reasonable. If, on the other hand, we accept the appellee's version of what happened, it was unquestionably unreasonable. The only remaining issue is that of which version of what happened shall we accept. What says our standard of review in that regard?

The supplemental rule of appellate review of fact-finding directs us to take that version of the evidence, including all reasonable inferences, most favorable to the prevailing party. In this case, that means accepting the inference that Officer Shaffer deliberately prolonged the traffic stop so as to facilitate the arrival of the K–9 unit. That being the case, the

length of the detention for the traffic stop, if we were called upon to decide that question, would have been unreasonable.

Quite obviously, had the State prevailed at the suppression hearing, our accepted version of the facts would be the precise opposite of what we are accepting as true in this case. This is a classic example of how this aspect of appellate review operates. Where we come out on a question is a function of where we go in.

The question with which we began this portion of our analysis, directing us to look at the duration of the traffic stop in a vacuum, was, however, a hypothetical. The question, helpful as it might have been to the appellee in other circumstances, is moot, because its hypothetical condition was not an operational fact. The traffic stop was not the sole Fourth Amendment predicate on which the detention rested in this case. Shortly after the traffic stop began, a supervening justification for a further and independent detention accrued.

### Sequential Bases For a Detention

The caselaw universally recognizes the possibility that by the time a legitimate detention for a traffic stop has come to an end, or more frequently while the legitimate traffic stop is still in progress, justification may develop for a second and independent detention. Unfolding events in the course of the traffic stop may give rise to *Terry*-level articulable suspicion of criminality, thereby warranting further investigation in its own right and for a different purpose.

*Ferris v. State*, 355 Md. at 372, 735 A.2d 491, recognized the potential for a traffic stop's transmuting into a *Terry*-stop for more serious crime.

> Thus, *once the underlying basis for the initial traffic stop has concluded, a police-driver encounter* which implicates the Fourth Amendment *is constitutionally permissible only if* either (1) the driver consents to the continuing intrusion or (2) *the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot.*

(Emphasis supplied). And see *Wilkes v. State*, 364 Md. at 574, 774 A.2d 420 ("[O]nce the initial purpose for a stop is fulfilled, *a continued detention is only permissible if justified by additional independent reasonable articulable suspicion.*" (Emphasis supplied)).

*Munafo v. State*, 105 Md.App. at 670, 660 A.2d 1068, also acknowledged the possibility of a second and independent detention, legitimate just so long as there is a second and independent justification for that detention.

> Once that purpose [of a traffic stop] has been satisfied, *the continued detention for a vehicle and its occupants constitutes a second stop, and must be independently justified* by reasonable suspicion.

(Emphasis supplied).

■ This question of a reasonable basis for an independent and supervening *Terry*-stop, moreover, is one calling for our *de. novo* independent constitutional appraisal. "Whether the appellant was effectively stopped twice for constitutional purposes is not a question of fact, but one of constitutional analysis." *Munafo v. State*, 105 Md.App. at 672, 660 A.2d 1068.

### Articulable Suspicion Of Drug Trafficking

Immediately on approaching the driver's window of the stopped Cadillac, Officer Shaffer developed a *Terry*-level articulable suspicion that the car and its occupants were engaged in a possible violation of the narcotics laws. Officer Shaffer first testified that the illegal tint of the windows was, to his trained eye, one indication of possible narcotics trafficking.

> *[M]y frame of reference includes training* that I have had through Top Gun, which is in Pennsylvania *put on by the Northeast Counter–Drug Trafficking Commission.* In that training *they showed us different pictures of tint and gave us examples.* And one of the examples was of 35 percent tint, which is the legal limit, you can clearly see the occupant. In this situation, I could not see the occupant.

Furthermore, *while I was in narcotics, I drove a vehicle that had about 15 percent tint.*

(Emphasis supplied).

Officer Shaffer also described how, as he stood at the driver's window, he detected

*a scent* that came out of the vehicle, *a very strong odor of air fresheners.* So *I* also *know that to be indicative of a masking agent for controlled dangerous substances.*

(Emphasis supplied). On cross-examination, he testified as to seeing "many" air fresheners.

Q. *You smell air fresheners; right?*

A. *That is correct.*

Q. Where were the air fresheners in the car?

A. There were air fresheners on the rear view mirror and the gear selector.

Q. So, you saw two air fresheners?

A. No, *I saw many air fresheners.*

Q. I just asked you where you saw them.

A. *There were many air fresheners in each location.*

(Emphasis supplied). The stop in this case, we note, was at the very end of October, a time hardly likely to involve rotting vegetables or heavy sweating so as to call for a wave of air freshening.

In addition to the air fresheners and the tinted windows, Officer Shaffer considered the "false identification" as an additional clue to trigger his suspicion as to drug activity.

A. *When I have* indications, such as *overpowering air fresheners, or someone who has given me a false identification,* or other reasons to arouse my suspicion, yes, *I have called for a drug dog.*

(Emphasis supplied).

### The Totality Approach to Reasonable Suspicion

 There might, of course, have been an innocent explanation for any of these phenomena, standing alone. That

is of no moment. Reasonable articulable suspicion is assessed not by examining individual clues in a vacuum but by getting a "sense" of what may be afoot from the confluence of various circumstances. Suspicion, particularly to a trained law enforcement officer, may be greater than the sum of its parts. It was of this gestalt approach to good detective work that the Supreme Court spoke in *United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989):

> *Terry* itself involved *"a series of acts, each of them perhaps innocent" if viewed separately, but which taken together warranted further investigation.* We noted in *Gates* that "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but *the degree of suspicion that attaches to particu-· lar types of noncriminal acts."* That principle applies equally well to the reasonable suspicion inquiry.

(Emphasis supplied).

Even more emphatic in that regard was the more recent and unanimous decision of the Supreme Court in *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002):

> When discussing how *reviewing courts* should make reasonable-suspicion determinations, we have said repeatedly that they *must look at the "totality of the circumstances"* of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."*

(Emphasis supplied).

The Ninth Circuit in *Arvizu*, in ruling that a *Terry*-stop had been unreasonable, had looked at each of seven factors in isolation and had found each susceptible of an innocent expla-

nation. In overruling the Ninth Circuit, the Supreme Court roundly rejected that fragmented approach to evaluation.

> *The court's* evaluation and *rejection of seven of the listed factors in isolation* from each other *does not take into account the "totality of the circumstances,"* as our cases have understood that phrase. *The court appeared to believe that each observation* by Stoddard that *was by itself readily susceptible to an innocent explanation* was entitled to "no weight." *Terry,* however, *precludes this sort of divide-and-conquer analysis.* The officer in *Terry* observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. *Although each of the series of acts was "perhaps innocent in itself,"* we held that, *taken together, they "warranted further investigation."*

534 U.S. at 274, 122 S.Ct. 744 (emphasis supplied).

The final holding of the Supreme Court left no doubt as to the proper standard of review.

> *A determination that reasonable suspicion exists,* however, *need not rule out the possibility of innocent conduct.* Undoubtedly, *each of these factors alone is susceptible to innocent explanation,* and some factors are more probative than others. *Taken together,* we believe *they sufficed to form a particularized and objective basis for* Stoddard's *stopping the vehicle,* making the stop reasonable within the meaning of the Fourth Amendment.

534 U.S. at 277–78, 122 S.Ct. 744 (emphasis supplied).

In *Carter v. State,* 143 Md.App. 670, 687, 795 A.2d 790 (2002), this Court also spoke of the invaluable advantage of seeing the big picture.

> The mosaic as a whole may depict a highly suspicious scene although none of its constituent tesserae, viewed in isolation, suggests anything untoward.

By way of our own independent constitutional determination, we hold that Officer Shaffer, minutes into the traffic stop, had developed *Terry*-level articulable suspicion that the car and its occupants were involved in a possible violation of the

narcotics laws. A fresh detention for a different purpose was thus in play. From that point on, the two detentions (actually, the two justifications) ran concurrently, and either alone, should the other have fizzled out, was enough to carry the Fourth Amendment burden.

## The Distinction Between a Traffic Stop And a *Terry*-Stop for Drugs

Once the analysis shifts from an examination of the reasonable duration of a traffic stop to the very distinct examination of the reasonable duration of a *Terry*-stop for suspected drug activity, a different standard for measuring the reasonableness of the length of detention is brought to bear on the problem. The entire argument of the appellee in this case is based on the false assumption that we are only measuring the reasonable duration of a traffic stop. We are not.

Precisely the same sort of mistake was made by the defendant in *Carter v. State*. That case did not involve a traffic stop at any time. It was, from its initiation, a *Terry*-stop for drug involvement. We went to some length to explain the difference between the two very different types of stop and the consequential irrelevance of traffic stop cases to a drug stop analysis.

> *This was not a traffic stop.* In terms of the permitted temporal scope of this particular *Terry*-stop, *the traffic stop cases have nothing to tell us.* The appellant, however, argues the duration of the detention as if this were a traffic stop case. . . .
>
> . . . .

The *Terry*-stop in this case was neither a traffic stop generally nor the opportunistic utilization of a traffic stop pursuant to *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), specifically. Those are situations in which the police must execute their traffic-related functions with diligence and may not prolong the traffic stop unnecessarily in order to "buy time" to carry out some extraneous investigative purpose for which they lack any particularized justification.

*The Terry-stop in this case was from the outset an investigation into a suspected narcotics violation. The use of a drug-sniffing canine was in the direct service of that purpose and was not a gratuitous investigative technique* hoping to piggyback on an unrelated traffic stop. The traffic stop cases are beside the point.

143 Md.App. at 688–89, 795 A.2d 790 (emphasis supplied).

Nothing so well symbolizes the difference between a traffic stop and a *Terry*-stop for drugs as their respective attitudes toward the presence of drug-sniffing dogs. The dog has no role to play in a traffic stop. The dog may be the star performer in a *Terry*-stop for drugs. The traffic stop, once completed, will not await the arrival of the dog for so much as 30 seconds. The *Terry*-stop for drugs very deliberately and patiently does await the arrival of the dog. The dog's arrival is, indeed, the primary reason for waiting.

In *Carter v. State,* 143 Md.App. at 692–93, 795 A.2d 790, we contrasted the non-function of the dog in a traffic stop with the core function of the dog in a *Terry*-stop for drugs.

*Once* a reasonable time for *the processing of a traffic charge has expired, even a minimal further delay to accommodate the arrival of a drug-sniffing canine is not permitted.* That foreclosure is for the obvious reason that *the dog sniff,* however valuable it might be for other investigative purposes, *does not in any way serve the purpose of the justifying traffic stop.* Once the purpose of the traffic stop has been fully and reasonably served, no further detention is permitted. . . .

When, by contrast, the energizing articulable suspicion is that a violation of the drug laws may be afoot, *the time constrictions on the Terry-stop are very different. The bringing of a drug-sniffing canine to the scene is in the direct service of that investigative purpose and the measure of reasonableness is simply the diligence of the police in calling for and procuring the arrival of the canine at the*

*scene.* This use of a trained dog, as will be discussed, is an investigative practice that is looked upon with favor.

(Emphasis supplied).

In a traffic stop, the dog is no more than a gratuitous interloper, whom the police may be lucky enough to sneak in through a side door before the traffic-related performance is over. In a *Terry*-stop for drugs, dog sniffing is, by contrast, a highly favored investigative modality. The prime purpose of a *Terry*-stop is to confirm or dispel the initial suspicion. In *State v. Gant,* 637 So.2d 396, 397 (La.1994), the Supreme Court of Louisiana praised the use of a drug-sniffing dog as a technique whereby the police "pursued a means of investigation likely to confirm or dispel their suspicions quickly." *United States v. Hardy,* 855 F.2d 753, 759 (11th Cir.1988), also extolled the virtues of the canine sniff.

> *The canine sniff* ordered in this case *is the kind of brief, minimally intrusive investigation technique that may justify a Terry stop.* As the Supreme Court noted in *Place, a canine sniff does not require the opening of luggage* and does not reveal intimate but noncontraband items to the public view. *"The manner in which information is obtained* through this investigative technique *is much less intrusive than a typical search." Nor does a canine sniff involve the time-consuming disassembly of* luggage or *an automobile frequently required in a thorough search for contraband.*

(Emphasis supplied).

### The Reasonable Duration Of the *Terry*–Stop for Drugs

■ The *Terry*-stop for drugs in this case, the duration of which we are now assessing, did not begin until several minutes after the initiation of the traffic stop. We may reasonably pinpoint the beginning of an independent *Terry*-stop for drugs at 12:30 p.m., when the request for a K–9 unit was placed. Prior to that, the traffic stop itself was in full and legitimate progress. The K–9 unit responded within 12 min-

utes of being requested. Within less than another five minutes, the canine "alert" was a *fait accompli.*

We see nothing remotely unreasonable about this 17–minute performance. The duration of the *Terry*-stop in *Carter v. State,* occasioned by a wait for the K–9 unit in that case, was considerably longer.

Our concern is only with the time period from 7:47 p.m. to 8:25 p.m. . . . . *Our concern will be whether a detention of 35–40 minutes exceeded* in its duration *the permissible scope of a Terry-stop.*

143 Md.App. at 674, 795 A.2d 790 (emphasis supplied).

We did not hesitate to affirm the reasonableness of that *Terry*-stop.

Following the initial stopping of the van, approximately ten minutes went by in which the police first sought the operator's card of the driver and then questioned first the driver and then the appellant about what they were doing on the school parking lot. Consent was then sought for a search of the van, which consent was refused. *It was at that point that the police requested that a drug-sniffing canine be brought to the scene. The dog arrived less than twenty-five minutes later. We see no lack of diligence.*

143 Md.App. at 696, 795 A.2d 790 (emphasis supplied). In assessing the duration of the *Terry*-stop, we note that the *Carter* Court subtracted ten minutes from the length of the total stop.

In *United States v. Hardy,* 855 F.2d at 761, a detention of 50 minutes was deemed to have been reasonable for bringing a dog to the scene of the stop.

*The investigative stop in this case lasted approximately fifty minutes,* from about 9:34 p.m., when Ralston informed appellants that they would be detained for a narcotics sniff, until about 10:25 p.m., when the narcotics dog alerted to the presence of drugs in the trunk.

. . . .

On the facts of this case, ... *we cannot say the length of the stop, by itself, invalidated the detention.*

(Emphasis supplied).

For a *Terry*-stop for a drug investigation, where the core purpose of confirming or dispelling suspicion could be eminently served by the use of a K–9 unit, nobody has ever found a delay of 16 or 17 (or 24 minutes) to be an unreasonable violation of the Fourth Amendment. See, for instance, *United States v. French,* 974 F.2d 687, 690–93 (6th Cir.1992) (*a 45 minute delay* while a drug dog was brought to a truck stopped on a highway); *United States v. Glover,* 957 F.2d 1004, 1012–13 (2d Cir.1992) (*a 30 minute detention was reasonable* because a "narcotics dog was on the way"); *Cresswell v. State,* 564 So.2d 480, 481 (Fla.1990) (*a 45 minute detention was reasonable* because it was "the time necessary to obtain a narcotics dog"); *State v. Gant,* 637 So.2d 396, 397 (La.1994) (*a 30 minute detention was reasonable* while a drug dog was brought to the scene). And see *United States v. Hooper,* 935 F.2d 484, 498 (2d Cir.1991) (*30 minute detention* pending arrival of narcotics dog); *United States v. Knox,* 839 F.2d 285, 290–91 (6th Cir.1988) (*30 minute detention* pending arrival of narcotics dog); *United States v. Sullivan,* 903 F.2d 1093, 1097–98 (7th Cir.1990) (*45 minute detention* pending arrival of narcotics dog); *United States v. Sterling,* 909 F.2d 1078, 1081, 1085 (7th Cir.1990) (*75 minute delay* pending arrival of narcotics dog); *United States v. Mondello,* 927 F.2d 1463, 1471 (9th Cir.1991) (*30 minute detention* pending arrival of narcotics dog); *United States v. Nurse,* 916 F.2d 20, 24 (D.C.Cir.1990) (*20 to 30 minute detention* pending arrival of narcotics dog); *United States v. Borrero,* 770 F.Supp. 1178, 1189–91 (E.D.Mich.1991) (*70 minute detention* pending arrival of narcotics dog) (emphasis supplied).

The court below was in error in suppressing the physical evidence in this case.

**SUPPRESSION RULING VACATED AND CASE REMANDED FOR TRIAL; COSTS TO BE PAID BY APPELLEE.**