24 A.3d 122

**Tavon Jamaal PARTLOW**

v.

**STATE of Maryland.**

**No. 2244, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

July 5, 2011.

Kellie M. Black (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., MATRICCIANI, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

RAYMOND G. THIEME, JR. (Retired, Specially Assigned), J.

Tavon Jamaal Partlow, appellant, was charged with possession of and possession with intent to distribute cocaine, a Schedule II controlled dangerous substance ("CDS"). Prior to trial before the Circuit Court for Harford County, appellant moved to suppress the drug evidence recovered by police following a traffic stop of the vehicle he was driving. That motion was denied, and appellant subsequently proceeded by way of a not guilty plea on an agreed statement of facts. Appellant was convicted of possession with intent to distribute. The State *nol prossed* the remaining charge, and the court imposed a sentence of 20 years in prison, suspending all but seven years, to be served concurrently with any other outstanding or unserved sentence. This timely appeal followed.

Appellant presents only one question for our review:

Did the trial court err in denying the motion to suppress?

We answer appellant's question in the negative, and we thus affirm the judgment of the circuit court.

## FACTS and LEGAL PROCEEDINGS

### Hearing on the Motion to Suppress

On April 29, 2009, appellant was heard on his motion to suppress the CDS evidence recovered from his person when the car he was driving was stopped by police. The following evidence was adduced at that hearing.

Harford County Sheriff's Office Deputy First Class Robert Schultz was on patrol on February 3, 2009 when he received a call from dispatch at approximately 9:00 p.m. The dispatcher relayed that a caller had witnessed what he or she believed to be a drug transaction in the area of Woodbridge. The caller stated that the deal involved an unidentified male and a black male in a tan colored Cadillac with tag number 5EHW11.[1]

---

1. At the hearing, Schultz was unable to remember the tag number, but he stated that dispatch had given him a valid tag number for the

DFC Schultz located the subject Cadillac—which matched the description in the tip exactly—several blocks from where the caller had seen the alleged drug deal occur. When Schultz observed the Cadillac proceed through an intersection without coming to a complete stop at a stop sign, he pulled in behind the Cadillac. At that time, he further observed that the vehicle's third brake light was not fully illuminated.[2]

At 9:38 p.m., Schultz initiated a traffic stop of the vehicle, with only the driver inside, whom Schultz identified as appellant. Upon speaking with appellant, Schultz recognized him as the subject of a criminal investigation Schultz had undertaken a few years earlier. Schultz said he knew that appellant had been involved in drug activity in the past. He was also aware that appellant's name was on a list of known gang members in Harford County.[3] Schultz also noticed "a large amount of U.S. currency overflowing from the center armrest," as well as numerous air fresheners in the car, which, to him, indicated an attempt to mask the smell of CDS.

Schultz returned to his cruiser to verify appellant's license and registration and to run a warrants check; everything was in order. Within one minute, he also called for a K9 officer to conduct a scan of appellant's vehicle for the odor of narcotics. Before the K9 unit arrived, Schultz's partner conducted a pat-down of appellant's person for weapons; none was recovered.[4]

Corporal John Seilback of the Harford County Sheriff's Office K–9 unit arrived at the scene of the stop with his dog,

---

Cadillac. The CADD dispatch report, which was admitted as a State's exhibit, refreshed his memory as to the actual tag number.

2. Schultz readily admitted that it was his intention to stop the vehicle for a drug investigation, so long as he could find a valid traffic violation to form the basis of the stop.

3. Schultz was unaware of the manner in or the reason for which appellant's name appeared on the gang member list. Appellant's mother, Angela Webb, denied that he was involved in any type of gang activity, but she admitted that he had been incarcerated until 2008 on a charge of CDS possession with the intent to distribute.

4. This initial pat down was not contested.

Sabre, at 9:50 p.m., after having been dispatched at 9:39 p.m. Schultz said that when the K–9 unit arrived, he had not yet completed writing the warnings for appellant's two traffic violations. Upon his arrival, Corporal Seilback scanned the Cadillac. Sabre gave a positive alert for the odor of narcotics along the driver's door.

Following the alert, Schultz undertook a further search of appellant's person, during which he felt a hard object "underneath Mr. Partlow's buttocks within his clothes." Appellant's jeans were secured with a belt below his buttocks, with his underwear showing above the waistband of the jeans. When Schultz felt the item under appellant's buttocks, he attempted to remove it, but it would not come loose. Therefore, Schultz pulled the underwear away from appellant's body and used a pocket knife to cut a small piece—"the size of a baseball maybe"—out of the underwear to retrieve the item, which he believed to be crack cocaine. The search left a portion of appellant's buttocks exposed. The suspected CDS was recovered at 9:56 p.m.

Schultz advised appellant he was under arrest and read him his *Miranda*[5] rights. He then searched the vehicle, which turned up $1091; no CDS was located in the vehicle. Schultz said that appellant advised he had "just gotten back into it, referring to the selling of CDS," because the economic recession had caused him to fall upon hard times.

In closing, the State argued that when Schultz received the tip about a drug deal, which included the approximate location of the deal, the type of car, exact license plate, and description of the driver, he had a reasonable, articulable suspicion to believe that a crime had occurred and thus a lawful basis on which to stop appellant's car. When appellant did not stop fully at a stop sign and was observed driving with a nonfunctional brake light, Schultz also had a legitimate basis upon which to effectuate a valid traffic stop. Once he made the

---

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

stop and realized that he was familiar with appellant's past drug and gang related activities, and additionally observed a large amount of currency and numerous air fresheners in the car, Schultz had a reasonable, articulable suspicion of drug activity to support his call to the K–9 unit.

The State further argued that the traffic stop was not unnecessarily delayed and the continued detention of appellant was lawful because they had reasonable suspicion to believe he was involved in illegal drug activity. Once the K–9 dog alerted for narcotics in the vehicle, Schultz had a lawful basis to arrest appellant and search his person, as he was the driver and sole occupant of the car.

With regard to the search in which a portion of appellant's underwear was cut to retrieve the suspected drug evidence, the State noted that the parties agreed that appellant was not disrobed at any time and argued that his modesty must give way to "reasonable precautionary procedures designed to protect evidence, drugs or objects that might be used against others or might cause sudden inflicted harm." Furthermore, there was no testimony that anyone other than the police officers was present at the search to violate appellant's privacy. In light of the circumstances, the State concluded, the search of appellant's person was not unreasonable.

The defense argued that the traffic stop was a mere pretense for a drug investigation because the police cruiser dashboard video showed appellant neither failing to make a full stop at the stop sign nor driving with an unilluminated brake light. Once Schultz stopped the vehicle on the pretense of a traffic stop, counsel continued, he immediately called for the K–9 unit, rendering the stop not a traffic stop but a drug stop with the pretext of a traffic stop without the requisite probable cause to undertake the ensuing investigation.

Furthermore, appellant averred, Schultz had probably completed writing the traffic violation warnings before the K–9 unit arrived, so even if the traffic stop had been valid at the start, it was complete before the drug alert by the drug sniffing dog, thereby rendering the continued detention a

second detention without the requisite probable cause. As such, appellant concluded, the drug evidence was illegally obtained from his person.

As for the search of his person, appellant stated that exposing one's buttocks to passers by is "not the kind of thing we want to do to people that are stopped for traffic stops. . . . [T]hat's not the way police are expected to conduct themselves in terms of going down in peoples' private areas if it can be done in private areas."

The court found that the initial stop was legitimate, as Schultz had observed appellant commit stop sign and brake light violations. The detention was thus legal so long as no more time passed than it took the officer to process the traffic issues, and the testimony showed that the K–9 dog alerted for drugs before Schultz had completed the writing of the two warnings.

The court thus ruled that the length of the detention was not beyond what was necessary to process the traffic violations, but even if it were, Schultz had a reasonable, articulable suspicion to continue the search based on a complaint of a drug sale made in appellant's car, the matching license tag number, and the matching description of appellant. Furthermore, the officer realized he had personal knowledge of appellant being involved in prior drug and gang activities. The officer also saw a large amount of cash in plain view and numerous air fresheners, both of which could reasonably be associated with drug activity. The court concluded that all the factors, taken as a whole, supported a finding that Schultz had a reasonable suspicion for a search.

As to the circumstances of the search, the court found that there was "no grand display or embarrassing process," as the search was probably not seen by anyone other than police personnel. In any event, the court said, the search was not a strip search and was not unreasonable, due to its location and minimal body exposure.

In sum, the court ruled the searches of the car and of appellant to be lawful once the K–9 dog alerted to the pres-

ence of drugs. The court therefore denied appellant's motion to suppress.

## Trial

On October 13, 2009, appellant proceeded by way of a not guilty plea on an agreed statement of facts to the charge of possession of cocaine with intent to distribute.[6] The agreed statement of facts essentially mirrored the testimony provided at the suppression hearing, with the addition of the following facts: 1) the Maryland State Police Crime Lab verified that the suspected CDS evidence seized from appellant comprised 8.8 grams of cocaine, and; 2) Sergeant John Burton of the Maryland State Police would have testified as an expert in the identification, packaging, and distribution of CDS that the quantity and packaging of the CDS, along with the amount of money recovered, were consistent with intent to distribute and not personal use.

From the facts presented, the court found appellant guilty beyond a reasonable doubt of possession with the intent to distribute cocaine. The State *nol prossed* the simple possession count, and appellant was sentenced, as noted above.

## DISCUSSION

Appellant contends that the suppression court erred in denying his motion to suppress the CDS evidence. He argues, as he did before the trial court, that: 1) the delay between the pretextual traffic stop and the canine alert was longer than necessary to accomplish the objective of the traffic stop and was not supported by reasonable suspicion, and; 2) the public strip search was unreasonable.

The State disagrees, arguing that the length of time between the onset of the traffic stop and the K-9 alert was not unreasonable and that, in any event, at the outset of the traffic stop, the police had reasonable suspicion to believe appellant

---

6. The judge presiding over appellant's trial was not the same judge who had earlier denied appellant's motion to suppress.

was involved with illegal drug activity and thus to detain him until the K–9 unit arrived. Additionally, the police search of appellant's person after the K–9 unit alerted to the car for CDS was reasonable, given the circumstances.

■■■■ Our review of a circuit court's denial of a motion to suppress evidence is ordinarily limited to information contained in the record of the suppression hearing and not the record of the trial. When the motion to suppress has been denied, we consider the facts in the light most favorable to the State as the prevailing party on the motion. *Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372 (2003) (citing *State v. Collins,* 367 Md. 700, 706–07, 790 A.2d 660 (2002)).

■■■■ We do not engage in *de novo* fact finding. Instead, we " 'extend great deference to the findings of the motions court as to first-level findings of fact and as to the credibility of witnesses, unless those findings are clearly erroneous.' " *Padilla v. State,* 180 Md.App. 210, 218, 949 A.2d 68 (quoting *Brown v. State,* 397 Md. 89, 98, 916 A.2d 245 (2007)), *cert. denied,* 405 Md. 507, 954 A.2d 468 (2008). We do, however, review *de novo* all legal conclusions, "making our own independent constitutional determination of whether the search in question was lawful." *Conboy v. State,* 155 Md.App. 353, 362, 843 A.2d 216 (2004).

■■■■ The Fourth Amendment to the United States Constitution [7] prohibits unreasonable governmental searches and seizures, and its protections extend to brief investigatory police stops of persons or vehicles that fall short of traditional arrest. *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, because the "balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases,

---

7. The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides, in pertinent part: "The right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const., Amend. IV.

the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *U.S. v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotes and citations omitted). Under *Terry* and its progeny, police may, under appropriate circumstances and in an appropriate manner, conduct a brief investigatory stop if "there is a reasonable and articulable suspicion that the person is involved in criminal activity." *Nathan v. State,* 370 Md. 648, 660, 805 A.2d 1086 (2002).

■ The Supreme Court has held that a "stop and frisk" may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures, so long as two conditions are met. First, the investigatory stop must be lawful, that is, the police officer must reasonably suspect that the person apprehended is committing or has committed a criminal offense, and second, to proceed from the stop to the frisk, the officer must reasonably suspect that the person stopped is armed and dangerous. *Arizona v. Johnson,* 555 U.S. 323, 129 S.Ct. 781, 784, 172 L.Ed.2d 694 (2009) (citing *Terry, supra).* In the context of a traffic stop, the first *Terry* condition, a lawful investigatory stop, is met whenever police may lawfully detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not, in addition, believe any occupant of the vehicle is involved in criminal activity. *Id.*

■ In this matter, Deputy Schultz indicated that he stopped appellant's vehicle when it ran a stop sign and proceeded on a public road with one of its brake lights partially nonfunctional. Therefore, although he admitted that he had been hoping appellant would commit a traffic violation to support a drug investigation, Schultz had at least a reasonable, articulable suspicion on which to base the initial traffic stop, notwithstanding the fact he may have had some other purpose in mind in making the stop. *See Whren v. U.S.,* 517 U.S. 806,

813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).[8]

Although appellant, at the suppression hearing, denied that he had committed a traffic violation, on appeal, he does not contest the reasonableness of the initial traffic stop, so the legality of the beginning of his detention is established. *State v. Ofori*, 170 Md.App. 211, 220, 906 A.2d 1089, *cert. denied*, 396 Md. 13, 912 A.2d 649 (2006). He also makes no attempt to assail the alert by the K–9 dog itself as probable cause for his subsequent arrest and search. He contends, instead, that the time between the detention related to the initial stop and the alert by the K–9 unit was unreasonable to the point of creating a second detention, which was unsupported by probable cause.

We disagree with the appellant's contention of the need for probable cause. It is well settled that police may stop and briefly detain a person for purposes of investigation if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *See Terry*, 392 U.S. at 30, 88 S.Ct. 1868; *see also Stokes v. State*, 362 Md. 407, 415–16, 765 A.2d 612 (2001). With any analysis of reasonable suspicion, the totality of the circumstances must be considered. *See, e.g., United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

As the trial court recognized, there were a number of factors, when taken "in combination," constituted reasonable articulable suspicion to continue the detention of Partlow until the arrival of the police dog. Partlow's car, a champagne-colored Cadillac, and his license plate matched the description of the car that was alleged to have been involved in a drug transaction a short time before and in the same vicinity as where Partlow was stopped. When Deputy Schultz, who had

8. In *Whren*, the Supreme Court allowed law enforcement officers "a sweeping prerogative, permitting them to exploit the investigative opportunities presented to them by observing traffic infractions even when their primary subjective intention is to look for narcotics." *Charity v. State*, 132 Md.App. 598, 601, 753 A.2d 556 (2000). If the traffic stop is a ploy, "it is a ploy that the Fourth Amendment forthrightly condones." *Jackson v. State*, 190 Md.App. 497, 503, 988 A.2d 1154 (2010).

training and experience in drug investigations, approached the car, he recognized Partlow from prior drug activity and he understood that Partlow's name was on a list of gang members. Deputy Schultz observed in plain view a large amount of currency overflowing from the center armrest area of the vehicle, which the trial court recognized as possibly indicative of illegal drug activity, and also a number of air fresheners in the car.

We have stated that the use of a drug sniffing dog is "a perfectly legitimate utilization of a free investigative bonus" to a valid traffic stop, so long as the traffic stop is still genuinely in progress when the dog alerts to the presence of narcotics. *Ofori*, 170 Md.App. at 235, 906 A.2d 1089. The courts, however, attempt to impose a restraint upon police by ensuring that traffic stops are not unduly prolonged simply to allow more time for the K–9 unit to arrive on the scene. *Id.* The basic rule is easy to articulate: once the traffic-related purpose of the stop has been met, any detention based on the traffic stop should end, and the detainee should be permitted to leave the scene immediately. There is "no waiting for the arrival, even the imminent arrival, of the K–9 unit." *Id.* If the traffic stop has ended, any further detention will only be permitted if there is an independent justification for it. *Id.* at 236, 906 A.2d 1089.

There is no hard and fast amount of time that is deemed reasonable to complete a traffic stop. *Charity*, 132 Md.App. at 617, 753 A.2d 556. A detention may simply not extend "beyond the period of time that it would reasonably have taken for a uniformed officer to go through the procedure involved in issuing a citation to a motorist." *Pryor v. State*, 122 Md.App. 671, 682, 716 A.2d 338 (1998). If the officer issuing the citations is legitimately still working on those citations when the K–9 unit arrives, the traffic stop is still ongoing, and the detention will be considered reasonable for Fourth Amendment purposes. *Ofori*, 170 Md.App. at 243, 906 A.2d 1089.

The officers testified to the following time line in this matter: DFC Schultz initiated the traffic stop at 9:38 p.m.; he called for the K–9 unit within one minute; Corporal Seilback of the K–9 unit was dispatched at 9:39 p.m.; Seilback and his dog, Sabre, arrived at the scene at 9:50 p.m.; Sabre alerted to the presence of drugs sometime before 9:56 p.m. because it was then that the CDS evidence was recovered. The entire detention thus lasted less than 20 minutes from the time of the initial stop.

When asked whether he wrote the two citations before or after the K–9 unit arrived at the scene, Schultz initially answered, "Before," but he then amended his answer to state, "Not completely. Both of them were not completed. No . . . . Both of the warnings were not completed prior to the dog's arrival. . . . No. I was writing them while the dog was responding. One was completed, one of them was not." He further stated that he did not intentionally wait for the dog to arrive before completing the citations, and no evidence to the contrary was presented.

In our view, this testimony is dispositive of the issue of whether the traffic stop and K–9 alert comprised one or two detentions. The amount of time elapsed between the initial stop and the K–9 alert was less than 20 minutes, not itself an unreasonable amount of time. *See, e.g., Ofori*, 170 Md.App. at 243, 906 A.2d 1089 (A 24 minute delay was not, in and of itself, inordinate); *Byndloss v. State*, 391 Md. 462, 492, 893 A.2d 1119 (2006) (30 minutes was not unreasonable).

While appellant makes much in his brief of the allegation that Schultz said he had completed writing the citations before the dog arrived, Schultz amended his answer and then did not waver from his statement that both citations were not complete before the dog arrived and that he did not intentionally prolong the process to await the dog's arrival. Keeping in mind that we must review the evidence in the light most favorable to the State as the prevailing party at the suppression hearing, we cannot say that the evidence shows that the processing of the citations was complete before the K–9 unit

arrived on the scene or that Schultz impermissibly prolonged the process to facilitate the arrival of the drug sniffing dog.

Therefore, in our view, the detention was no longer than necessary to facilitate the writing of the citations, and the alert by the K–9 dog was part of the initial detention. When the dog alerted to the presence of CDS in appellant's vehicle, Schultz's reasonable suspicion of criminal activity ripened into probable cause to arrest appellant and to search him incident to that arrest. *Ofori*, 170 Md.App. at 221, 906 A.2d 1089 (When the K–9 dog alerted to the presence of CDS in the car, the officers had "unquestionable probable cause for the warrantless arrest" of appellant as the driver of the Cadillac).

Even were we to determine that the traffic stop was complete before the K–9 unit arrived at the scene, such a conclusion would not be fatal to the State's case. The case law recognizes the

> possibility that by the time a legitimate detention for a traffic stop has come to an end, or more frequently while the legitimate traffic stop is still in progress, justification may develop for a second and independent detention. Unfolding events in the course of the traffic stop may give rise to Terry-level articulable suspicion of criminality, thereby warranting further investigation in its own right and for a different purpose.

*Id.* at 245, 906 A.2d 1089. Once the traffic stop is complete, a further detention is permissible if the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is still afoot. *Ferris v. State*, 355 Md. 356, 372, 735 A.2d 491 (1999).

Here, Schultz testified that he had received a tip—complete with make, exact tag number, and description of appellant— that appellant's vehicle had been involved in a drug deal just prior to the traffic stop. When Schultz pulled appellant over only a few blocks from where the alleged drug deal had occurred, he recognized appellant from previous drug activity, and he noticed a large amount of currency overflowing the center console of the vehicle and numerous air fresheners

inside the car.[9]  From his training and experience, Schultz stated that all the factors, taken together, raised his suspicion that appellant had committed a CDS violation.

Although each of these circumstances, taken by itself, was certainly subject to an innocent explanation, we have held that suspicion to a trained law enforcement officer "may be greater than the sum of its parts." *Ofori*, 170 Md.App. at 248, 906 A.2d 1089.  The officer may draw on his own experience and specialized training "to make inferences from and deductions about the cumulative information available to [him] that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744.

We thus conclude that mere moments into the lawful traffic stop, Schultz had developed a *Terry*-level articulable suspicion that the car and driver were involved in a possible violation of the CDS laws.  A fresh detention for a different purpose may have thus begun. From then on, "the two detentions (actually the two justifications) ran concurrently, and either alone, should the other have fizzled out, was enough to carry the Fourth Amendment burden." *Ofori*, 170 Md.App. at 250, 906 A.2d 1089.  Once the focus shifts to a drug investigation, the calling for the drug sniffing dog is "in the direct service of that investigative purpose and the measure of reasonableness is simply the diligence of the police in calling for and procuring the arrival of the canine at the scene." *Carter v. State*, 143 Md.App. 670, 693, 795 A.2d 790 (2002).  For all these reasons, the delay between the initial stop and the alert by the canine was in no way unreasonable.

Appellant next avers that the "strip search" of his person, leaving a portion of his buttocks exposed, was unrea-

---

**9.**  As we noted in *Jackson*, 190 Md.App. at 521, 988 A.2d 1154, "[t]here is nothing criminal, of course, about air fresheners," but, "[j]ust as some persons have a sweet tooth and others, an addiction to nicotine, drug couriers seem to enjoy an incorrigible affinity for air fresheners. Such olfactory delicacy, moreover, almost always helps to give them away."

sonable, and the motion to suppress should have been granted on that basis. Again, we disagree with appellant.

There is no doubt that once a K–9 dog alerts to the presence of narcotics in a vehicle, a police officer has unquestionable probable cause to undertake a warrantless arrest of the driver of the vehicle. *Ofori,* 170 Md.App. at 221, 906 A.2d 1089. There can be no dispute that appellant was lawfully arrested.

Once lawfully arrested, police may search the person of the arrestee, as well as the area within his control, to remove any weapons or evidence that could be concealed or destroyed. *Belote v. State,* 411 Md. 104, 113, 981 A.2d 1247 (2009). The question is whether a strip search or a "reach-in" search [10] is a reasonable search incident to arrest.

It is clear that a strip search may not automatically be conducted incident to arrest. Rather, Maryland's appellate courts have applied the analysis set forth in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), in addressing claims regarding the reasonableness of a strip search incident to arrest. *Allen v. State,* 197 Md.App. 308, 321, 13 A.3d 801 (2011). The *Bell* Court stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. at 559, 99 S.Ct. 1861.

First, it is by no means clear that appellant was even subjected to a strip search. In general, a strip search involves

---

**10.** A "reach-in" search is one that "involves a manipulation of the arrestee's clothes such that the police are able to reach in and retrieve the contraband without exposing the arrestee's private areas." *Paulino v. State,* 399 Md. 341, 360 n. 6, 924 A.2d 308, *cert. denied,* 552 U.S. 1071, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007).

the "*removal* of the arrestee's clothing for inspection of the under clothes and/or body." *State v. Nieves*, 383 Md. 573, 586, 861 A.2d 62 (2004) (emphasis added). In *Paulino,* however, the Court of Appeals acknowledged an alternate definition for a strip search as " 'any search of an individual requiring the *removal or rearrangement* of some or all clothing to permit the visual inspection of the skin surfaces of the genital areas, breasts, and/or buttocks.' " 399 Md. at 352–53, 924 A.2d 308 (quoting *Nieves,* 383 Md. at 586, 861 A.2d 62) (emphasis added).

In this matter, the officers testified that appellant was not required to disrobe; his clothing remained on his person at all relevant times. His jeans were worn and belted below his buttocks, leaving his underwear exposed at his waist, and presumably down past his buttocks to the top of his belted jeans. DFC Schultz stated he felt an object in appellant's underwear and that he pulled the underwear away from appellant's buttocks to retrieve it, but it was either tangled or sewn into the underwear, so it would not come loose. As a result, Schultz used a pocketknife to cut away a small portion of the underwear to retrieve the item, leaving a portion of appellant's buttocks exposed. Therefore, it would seem that the search of appellant fell somewhere between a reach-in and a strip search.

It is really of no moment, however, which type of search was involved. As noted in *Allen,* any search inside a person's clothing that allows an officer to view a suspect's private areas may be unreasonable unless reasonableness is determined by reference to the four factors set forth in *Bell:* 1) the scope of the particular intrusion; 2) the manner in which it is conducted; 3) the justification for initiating it, and; 4) the place in which it was conducted. 197 Md.App. at 323, 13 A.3d 801.

Applying these factors to the present case, we hold that the search of appellant's person was reasonable. Addressing, first, the justification for the search, Maryland appellate courts have held that a strip search or reach-in search incident to arrest may only be conducted if there is reasonable suspi-

cion to believe that drugs are concealed on the suspect's body. *Id.* Once the K–9 dog alerted for the presence of drugs in appellant's car, Schultz had probable cause to arrest appellant on at least suspicion of possession of CDS. In addition, Schultz had benefit of the tip that appellant had earlier been seen selling drugs from his car.

It is " 'well known in the law enforcement community, and probably to the public at large, that drug traffickers often secrete drugs in body cavities to avoid detection.' " *Id.* at 324, 13 A.3d 801 (quoting *Moore v. State,* 195 Md.App. 695, 718, 7 A.3d 617 (2010)). When a person is arrested for drug dealing, the "nature of the offense provides reasonable suspicion to believe that the arrestee is concealing drugs on his or her person." *Id.* Sufficient justification for the search has been shown.

Turning to the scope, manner, and location of the search, appellant contends it was unreasonable because it occurred on a public street and exposed a portion of his buttocks to passers by. Appellant's clothing was not removed from his body, however, and, indeed, his underwear was already exposed to the public by the manner in which he chose to wear his pants.

Schultz testified, and the suppression court credited his testimony, that he pulled appellant's underwear up after feeling a hard object under his buttocks, but he was unable to remove the object. He therefore cut away a small piece—less than the size of a baseball [11]—of appellant's underwear so as to remove the object. Schultz further testified that the search was undertaken on the passenger side of the police cruiser, away from the view of traffic, and that he generally stands behind the person he is searching to conduct the search. It thus appears that the officer made some effort to protect appellant's privacy.

---

11. The court found that the portion that was cut was about "the size of a pack of cigarettes."

Further, the court found, presumably from viewing the police cruiser's dashboard video, that appellant was wearing a long coat or shirt that covered his underwear, so the exposure was "not as bad as it initially sounds." The scope and manner of the search were not unreasonable under the circumstances.

With respect to the location of the search, appellant argues that it occurred on a public street, which impermissibly violated his privacy. Although the search was undertaken on a public thoroughfare, the testimony showed that it was conducted in an area that was "fairly wooded" on one side. The other side of the street did contain houses, but most of the houses were 30 to 40 yards away from the street, and the search did not occur in front of a house. Moreover, it was "fairly dark" at the time, and, as noted above, the suppression court found that appellant's coat or shirt covered the area he alleged was exposed. Only police officers were present during the search; no civilians were in the area, and no cars stopped on the side of the road.

When asked by defense counsel if he could have taken appellant somewhere private to conduct the search, Schultz stated, "Not at that point" because the officers "wanted to preserve the evidence, make sure it was not discarded in some way." Although the suppression court agreed that it may "have been a nicer idea to do it in the confines of a room in a police station," it credited the officer's testimony that he took some precautions to ensure appellant's privacy and found that the small amount of exposed skin on his buttocks did not render the search unreasonable.

Appellant relies on *Paulino*, 399 Md. at 361, 924 A.2d 308, in which the Court of Appeals held that a strip search in a public place was unreasonable when there were no exigent circumstances to justify a public strip search. In *Paulino*, however, the police conducted the search of the suspect in the bay of a brightly lit carwash, in front of at least his co-suspects. Moreover, he was placed prone on the ground, and his buttocks were spread open to allow a better view of his anal cavity. It was the manipulation of his intimate body parts,

along with the lack of any evidence that his privacy was protected in any way, that led the Court to hold that the search was both a strip search and a visual body cavity search and unreasonable. The Court stated, however, that if the officers had seen the drugs "without spreading his buttocks cheeks," the search might have been classified as a permissible "reach-in" search. *Id.* at 353–54, 924 A.2d 308.

In the present case, the search was not as invasive as the one in *Paulino.* The search was brief, appellant was not disrobed, his private parts were not manipulated, and there were no non-police citizens around to view the cutting away of a small portion of appellant's underwear that was covered by a long shirt or coat. After balancing the four *Bell* factors, we hold the search was reasonable under the Fourth Amendment.

JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.