REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1394

September Term, 2014

---

IRA CHASE

v.

STATE OF MARYLAND

---

Meredith,
Berger,
Kenney, James A., III
   (Retired, Specially Assigned),

JJ.

---

Opinion by Kenney, J.

---

Filed: August 31, 2015

Appellant, Ira Chase, was indicted in the Circuit Court for Baltimore County, Maryland, and charged with possession of cocaine with intent to distribute and related offenses. After his motion to suppress was denied, he entered a conditional guilty plea to possession of cocaine with intent to distribute pursuant to Maryland Rule 4-242(d). He was sentenced to one year, all suspended, and was placed on probation for one year. In his timely appeal, he presents the following question for our review:

Did the trial court err in denying the motion to suppress?

For the following reasons, we shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Suppression Hearing

Detective Andrew Melnyk, and his partner, Detective Young,[1] assigned to the Vice/Narcotics Section of the Baltimore County Police Department for the last six months prior to the hearing, were on patrol on September 10, 2013, in the Security Boulevard section of the county, close to Interstates 70 and 695. This area, according to Detective Melnyk, was known for "illicit narcotic activity."

That evening, the detectives went to the Days Inn hotel, located on Whitehead Court in Baltimore County, Maryland.[2] Detective Melnyk knew this particular hotel from working

[1] Detective Young's first name is not in the record.

[2] The transcript erroneously lists the address as "Lighthead Court."

patrol in the area since 2008, and that the hotel was located in a "high area of drug trafficking." He also testified, with respect to the hotel, that he had "participated in numerous search warrants and apprehensions resulting in the seizure of illicit drugs and U.S. currency, as well as weapons."

They pulled into the Days Inn parking lot at around 6:45 p.m. and noticed a white Jeep Cherokee backed into a parking spot on the lot. The occupant of the Jeep, later identified as appellant, was talking on his cell phone. About two minutes later, a Lexus backed adjacent to the Jeep, taking up two designated spots, despite the fact that the remainder of the parking lot was virtually empty. The driver of the Lexus exited his vehicle and got into the passenger side of the Jeep.

Detective Melnyk testified, over a general objection, that based on a forty hour narcotics investigator class, as well as a weeklong class at the Academy for drug identification and characteristics of people involved in distribution of narcotics, that individuals will use vehicles "to conceal the transactions from law enforcement," and will operate from a "hotel to conceal the identity of their home address." Although not testifying as an expert, Detective Melnyk, based on his experience in the Vice/Narcotics Unit, testified:

> So with the Defendant in his vehicle, as well as the Lexus pulling in and the driver of the Lexus getting out of his vehicle into the Defendant's vehicle, as well as the area that they're in, it's a known high drug area, they did not utilize any services of the Days Inn, which is where they were parked. We believed that there was illegal drug activity taking place, or criminal activity at that

2

matter.

Within five minutes after entering the Days Inn lot, at approximately 6:50 p.m., the two detectives decided to approach the Jeep to investigate and "detained both occupants" based on reasonable articulable suspicion that they were involved in illegal activity. Detective Melnyk explained:

> We noticed, as we were approaching the vehicle, the driver specifically, as well as the passenger, they were moving, looks like they were moving things around there, reaching under the seat. The passenger immediately put his hands in his pocket. At that point, for the safety of myself and Detective Young, they were requested to exit the vehicle and we put them in handcuffs just to make sure they didn't have any weapons and detaining them. They were not free to leave. The, the reason for the handcuffs were solely based on the safety of everyone involved, based on the furtive movements that we observed inside the vehicle as we were approaching the vehicle.

Appellant and the driver of the Lexus, Michael DeLillo, III, were patted down and read their rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The pat down revealed no weapons. DeLillo stated that he was at the hotel to meet some unidentified individual named "Phil" to watch an Orioles game. Appellant indicated that he was going to meet his cousin at the Maryland Live Casino. During this conversation, appellant was "very irate," and claimed "that he had done nothing wrong." On cross-examination, Detective Melnyk reaffirmed that both individuals were being detained and were not free to leave at this time.

At this point, approximately 6:52 p.m., Detective Melnyk contacted police dispatch to request that a K-9 unit respond to the scene. The K-9 arrived within minutes, and at 7:00

3

p.m., the dog alerted on the passenger side door of the Jeep. Appellant was then placed under arrest and was searched incident to the arrest. Police recovered some currency and a Days Inn room key, but no drugs were found on his person or in his Jeep.

DeLillo was also arrested and when he was searched, police recovered fourteen grams of cocaine, valued at around $700 to $900. DeLillo later spoke to police and, in a written statement, confirmed that he was in the parking lot for the sole purpose of obtaining 3.5 grams of cocaine. He brought $345 to make that purchase, but appellant gave him 14 grams of cocaine instead.

Both appellant's and DeLillo's cell phones were also seized incident to their arrest. DeLillo's phone contained text messages indicating that he was obtaining quantities of "girl." Detective Melnyk testified, based on his training, knowledge and experience, that "girl," referred to cocaine powder. Some of the text messages were with "Fat Boy," which police determined was appellant's nickname. Once the police confirmed that the room key found on appellant's person was for a room at the Days Inn, they applied for, and obtained, a search warrant for that room.

After hearing argument, the court denied the motion to suppress, stating:

> Okay. It's a very interesting case. I'm familiar with all the cases you've handed up, [Prosecutor]. The *Carter* case is of particular interest, it's one of Judge Moylan's shorter opinions. The man was stopped or he wasn't stopped, he's already parked under the policeman's observation when the other car pulls in. They're backed in next to each other, it's a high crime area.

4

I'm familiar with the area. I don't know how many cases I've had from that side of town involving drugs. They're in the parking lot of the hotel, nobody gets out of the car, goes into a hotel, don't do anything except meet each other at a car. The furtive acts give me some concern because of the officers['] safety. They see this going on inside the vehicle as they're approaching. The inconsistent stories, you know, one's watching the ballgame, the other one is going to Maryland Live Casino. I think that's what really triggered the call for the K-9 to come out and it was fairly quick after they were stopped. I believe the K-9 arrived within ten minutes of the police approaching the vehicle to begin with. I think it is a classic Terry case, (inaudible) to the high crime in the area, drugs, we know that guns are involved with drugs. So I can understand the concern for officers' safety. The dog alerts on the side of the vehicle that Mr. DeLillo just got out of and he's the one who later on states, you know, I came to buy an eight ball to get, got fourteen grams, got more than he came for. Certainly, got more than he came for when he got the cuffs on him. I believe I don't have any choice but to deny your Motion, [Defense Counsel]. I think it's a good stop, it's a good search. I was concerned about the cuffs going on when they went on and the comments that were made by the two gentlemen were after they were read Miranda. They were Mirandized right away. I know you disagree with me, Mr. [Chase], you've been sitting there shaking your head sideways since you came in the door today. The Motion to Suppress is denied. . . .

## Conditional Guilty Plea

With the consent of the court and the State, Chase entered a conditional guilty plea to possession of cocaine with intent to distribute pursuant to Maryland Rule 4-242(d). The prosecutor summarized the factual basis for the guilty plea as follows:

> Your Honor, the summary of the facts in support of the conditional guilty plea that I provided the court are as, are as follows: On September 10th of 2013, Baltimore County police were on undercover surveillance on Whitehead Court in Baltimore County. They know this to be a high crime, high drug area. When they saw what they believed to be a hand to hand drug transaction, they stopped the parties involved. One of those parties was

identified as this Defendant, Ira Chase, to my left and with counsel before you. There was a series of incidents and conversations that eventually led to a search warrant of a room that was associated with Mr. Chase. He was associated to that room by the staff of the Days Inn, as well as by a key that was found on his person. Search of that room yielded a large amount of cocaine, a schedule two, controlled dangerous substance, specifically one hundred and eight grams along with unused sandwich baggies, a digital scale and other indicia that to an expert in the sale of packaging, distribution of street level narcotics would indicate that the items found in a room associated to Mr. Chase and in his possession would be possessed with the intent to distribute.

Based on the statement of facts, the court found Chase guilty of possession of cocaine with intent to distribute.

## DISCUSSION

Our standard of review is as follows:

> In reviewing a circuit court's grant or denial of a motion to suppress evidence, we ordinarily consider only the evidence contained in the record of the suppression hearing. The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party. We undertake our own constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case.

*McFarlin v. State*, 409 Md. 391, 403 (2009) (quoting *Rush v. State*, 403 Md. 68, 82 (2008) (citations omitted)).

Appellant contends that he was arrested prior to the positive alert by the dog, while the State essentially maintains that appellant was simply subject to an investigative detention

6

supported by reasonable articulable suspicion until the canine alert. Appellant argues that

he was not merely detained because he had been removed from the vehicle, handcuffed, read

his *Miranda* rights and questioned. And, because the arrest was not supported by probable

cause, it was unlawful and therefore, everything that was recovered afterwards is the fruit

of the poisonous tree. The State also argues, for the first time on appeal, that, even if the

arrest preceded the arrival of the drug dog, there was probable cause to support an arrest.[3]

Here, there is little, if any, dispute that probable cause to arrest existed after the drug

dog alerted on the Jeep. *See State v. Wallace*, 372 Md. 137, 146 (2002) ("Further, the law

is settled that when a properly trained canine alerts to a vehicle indicating the likelihood of

contraband, sufficient probable cause exists to conduct a warrantless '*Carroll*' search of the

vehicle"), *cert. denied*, 540 U.S. 1140 (2004); *Wilkes v. State*, 364 Md. 554, 586 (2001) ("We

have noted that once a drug dog has alerted a trooper to the presence of illegal drugs in a

vehicle, sufficient probable cause exist[s] to support a warrantless search of [a vehicle]."

(Internal quotation and citations omitted)); *Stokeling v. State*, 189 Md. App. 653, 664 (2009)

_____

[3] The State also asserts, without further authority or argument, that "[e]ven if probable cause was lacking, in searching Chase's hotel room, police relied in good faith on the warrant." A similar argument was not made during the motions hearing. Although we may consider the "good faith" exception even when it was not raised below, *see McDonald v. State*, 347 Md. 452, 470 n. 10 (1997), we need not consider the issue in this case and we would be reluctant to do so. *See Diallo v. State*, 413 Md. 678, 692-93 (2010) ("arguments not presented in a brief or not presented with particularity will not be considered on appeal" (citation omitted)).

(stating that dog "alert to the Chrysler gave the police probable cause to search it for illegal drugs"), *cert. denied*, 414 Md. 332 (2010); *State v. Ofori*, 170 Md. App. 211, 221, *cert. denied*, 396 Md. 13 (2006) ("[O]nce the K-9 'alerted' to the probable presence of contraband drugs in the [vehicle], all Fourth Amendment uncertainty came to an end.").

For Fourth Amendment purposes, there are three levels of interaction between the police and citizens:

> The most intrusive encounter is an arrest, which requires probable cause to believe that a person has committed or is committing a crime. The second category is the investigatory stop or detention, known commonly as a *Terry* stop, an encounter considered less intrusive than a formal custodial arrest and one which must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual. The third contact is considered the least intrusive police-citizen contact, and one which involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. A consensual encounter, or a mere accosting, need not be supported by any suspicion and because an individual is free to leave at any time during such an encounter, the Fourth Amendment is not implicated; thus, an individual is not considered to have been "seized" within the meaning of the Fourth Amendment.

*Wilson v. State*, 409 Md. 415, 440 (2009) (citation omitted).

There is no suggestion that this case involves a consensual encounter. The issue is whether it was an arrest or an investigatory *Terry* stop. With respect to an arrest, the Court of Appeals has explained:

> A show of force is objective conduct demonstrating the officer's intent to make an arrest. "[G]enerally, a display of force by a police officer, such as

8

putting a person in handcuffs, is considered an arrest." [*Longshore v. State*, 399 Md. 486, 502 (2007)]. In *California v. Hodari D.*, [499 U.S. 621, 626 (1991)], the Supreme Court of the United States held that "[a]n arrest requires . . . physical force" by "laying on of hands or application of physical force to restrain movement." Although the display of force often involves placing the individual who is seized in handcuffs, application of handcuffs is not a necessary element of an arrest. *See Grier v. State*, 351 Md. 241, 252 (1998) ("Once Petitioner was on the ground and in custody and control of the officers, he was certainly under arrest. Although [the officer] may have had the right to simply detain and question Petitioner before placing him in custody, he did not do so." (Citations omitted)); *Morton v. State*, 284 Md. 526, 530 (1979) (holding, where an officer removed the individual from a recreation center and placed him under guard in a patrol car, that "an arrest is the taking . . . by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest. . . . [The officer's] manual seizure of the appellant and the subsequent restraint of his liberty plainly constituted an arrest."); *Dixon v. State*, 133 Md. App. 654, 673 (2000) (officers exceeded the permissible scope of an investigative *Terry* stop and "arrested appellant at the time they blocked his car, removed him from his vehicle, and handcuffed him").

*Bailey v. State*, 412 Md. 349, 371-372 (2010) (parallel citations omitted).

On the other hand, as stated by the *Bailey* Court:

Conversely, even if the officers' physical actions are equivalent to an arrest, the show of force is not considered to be an arrest if the actions were justified by officer safety or permissible to prevent the flight of a suspect. *In re David S.*, 367 Md. 523, 539-40 (2002) (holding that a "hard take down" in which officers forced the individual to the ground and handcuffed him was a limited *Terry* stop, not an arrest, when the "conduct was not unreasonable because the officers reasonably could have suspected that the respondent posed a threat to their safety"); *Trott v. State*, 138 Md. App. 89, 118 (2001) (holding that "the handcuffing of appellant was justifiable as a protective and flight preventive measure pursuant to a lawful stop and did not necessarily transform that stop into an arrest"). The use of handcuffs in a seizure is not a dispositive factor in determining whether the seizure was a *Terry* stop or an

9

arrest.

*Bailey*, 412 Md. at 372 n. 8 (parallel citations omitted).

This Court, in *Johnson v. State*, 154 Md. App. 286 (2003), *cert. denied*, 380 Md. 618 (2004), reiterated the factors to consider in determining whether a suspect is under arrest:

> A *Terry* stop is distinguishable from an arrest in three important respects: the length of the detention, the investigative activities that occur during the detention, and the question of whether the suspect is removed from the place of the stop to another location. *Farrow v. State*, 68 Md. App. 519, 526 (1986) (citing *Florida v. Royer*, 460 U.S. 491 (1983)). "In determining whether an investigatory stop is in actuality an arrest requiring probable cause, courts consider the 'totality of the circumstances.'" *In re David S.*, 367 Md. [at 535] (quoting *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir.1981)). Under the totality of circumstances, no one factor is dispositive. See *Ferris v. State*, 355 Md. 356, 376 (1999).

*Id*. at 297 (parallel citations omitted); *see also Harrod v. State*, 192 Md. App. 85, 103 (2010) ("[T]here is no bright line marking the point at which a *Terry* stop and frisk rises to the level of an arrest"), *rev'd on other grounds*, 423 Md. 24 (2011).

In a totality of the circumstances analysis, the nature of the area is important in our consideration. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (investigatory stop in area known for heavy narcotics trafficking; "that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis" (citing *Adams v. Williams*, 407 U.S. 143, 144 (1972))); *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (law enforcement officers may consider an area's characteristics in deciding whether to make an

10

investigatory stop); *accord Holt v. State*, 435 Md. 443, 466 (2013). Detective Melnyk testified the Days Inn was in a "high area of drug trafficking . . ." And here, the motions judge recognized the area as one associated with narcotics in making his findings of fact.

In addition, Detective Melnyk testified, based on his training and experience, that the appellant's and DeLillo's behavior was suspicious. More specifically, he found it suspicious that they parked side by side in an otherwise empty hotel parking lot, and did not go into a hotel room but instead, met in appellant's vehicle, which suggested to him that they were attempting to conceal their activities. A police officer's experience and training are highly relevant in assessing either probable cause or reasonable suspicion. *See U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (a reviewing court must permit police officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person" (internal quotation and citation omitted)); *see also Holt*, 435 Md. at 461 ("We therefore assess the evidence through the prism of an experienced law enforcement officer, and give due deference to the training and experience of the . . . officer who engaged the stop at issue[.]" (Internal quotation and citations omitted)); *Crosby v. State*, 408 Md. 490, 508 (2009) ("In making its assessment, the court should give due deference to the training and experience of the law enforcement officer who engaged in the stop at issue") (citing *Ransome v. State*, 373 Md. 99, 104-05 (2003)).

As the two officers approached the vehicle, they noticed that both occupants were "moving, looks like they were moving things around there, reaching under the seat" and that "[t]he passenger immediately put his hands in his pocket." The detective characterized these movements as "furtive." The Supreme Court has noted that such nervous and evasive behavior can be a pertinent factor in determining reasonable suspicion. *Wardlow*, 528 U.S. at 124. And, as recognized by our Court of Appeals, "[c]onduct, including nervousness, that may be innocent if viewed separately can, when considered in conjunction with other conduct or circumstances, warrant further investigation." *McDowell v. State*, 407 Md. 327, 337 (2009).

According to Detective Melnyk, the detectives asked appellant and DeLillo to exit the vehicle, where they were handcuffed, and given their *Miranda* rights based on a concern for "the safety of everyone involved," and "to make sure they didn't have any weapons." The fact that the two handcuffed individuals were also read their *Miranda* rights is not dispositive in an "arrest" calculus. The Court of Appeals has stated that "courts have made clear that a cautious or gratuitous recitation of *Miranda* warnings is irrelevant to whether there has been an arrest, or even a custodial interrogation." *Cotton v. State*, 386 Md. 249, 266, *cert. denied*, 546 U.S. 885 (2005).

Nor is an investigative stop transformed into an arrest because appellant was handcuffed. As the Court of Appeals has recognized:

12

This Court has recognized that society has become more violent, that attacks against law enforcement officers have become more prevalent, that there is a greater need for police to take protective measures to ensure their safety and that of the community that might have been unacceptable in earlier times, and that *Terry* has been expanded to accommodate those concerns. In *In re David S.*, 367 Md. [at 534], we quoted with approval this passage from *United States v. Tilmon*, 19 F.3d 1221, 1224–25 (7th Cir.1994):

> "The last decade has witnessed a multifaceted expansion of *Terry*, including the trend granting officers greater latitude in using force in order to neutralize potentially dangerous suspects during an investigatory detention. For better or worse, the trend has led to the permitting of the use of handcuffs, for the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention."

> Our approval of "hard takedowns" in *David S*. and in *Lee v. State*, 311 Md. 642 (1988), as permissible *Terry* detentions rather than as arrests, confirms our acceptance of that observation. *See also Dashiell v. State*, 374 Md. 85 (2003).

*Cotton*, 386 Md. at 265 (parallel citations omitted).

Furthermore, "[w]e have often recognized the inherent dangers of drug enforcement, and an investigatory stop based upon a reasonable suspicion that a suspect is engaged in drug dealing, can justify a frisk for weapons." *Hicks v. State*, 189 Md. App. 112, 124 (2009); *see also Marks v. Criminal Comp.*, 196 Md. App. 37, 70 (2010) ("There can be no serious dispute that there is an intimate relationship between violence and drugs"); *Dashiell v. State*, 143 Md. App. 134, 153 (2002) ("Persons associated with the drug business are prone to carrying weapons"), *aff'd*, 374 Md. 85 (2003).

13

Appellant asserts that there was insufficient evidence that he was armed and dangerous so as to justify a frisk of his person. However, "*Terry* does not require a police officer to be *certain* that a suspect is armed in order to conduct a frisk for weapons. All that is required is a reasonable suspicion that the person is armed and dangerous." *In Re: David S.*, 367 Md. at 541.

Appellant contends that, even assuming there was reasonable suspicion for a brief detention and that the appellant and DeLillo were armed and dangerous, there was no basis for that concern after the police frisked him and DeLillo and found no weapons on their persons. Thus, at that point, the continuation of the detention and the questioning indicate an arrest. Under the totality of the circumstances, however, we are persuaded that the encounter remained an ongoing investigation under *Terry* and the failure of the officers to immediately remove the handcuffs after a brief pat down did not convert this detention into an arrest. *See Farrow v. State*, 68 Md. App. 519, 526 (1986) ("The distinction between a *Terry* 'stop' and an arrest, then, is not in the *method* of detention, but rather has to do with the length of the detention, the investigative activities during the detention, and whether the suspect is removed to a detention or interrogation area"), *cert. denied*, 308 Md. 382 (1987).

In support of his argument, appellant looks to *Payne v. State*, 65 Md. App. 566 (1985), *cert. denied*, 305 Md. 621 (1986), a thirty-year-old case that precedes many of the more drug-specific cases of recent vintage. There, an officer on routine patrol in a high

crime area of Baltimore City observed a vehicle double parked and impeding traffic. *Id.* at

568. When the officer pulled up behind the vehicle to effect a stop, Payne, the driver, bent

over as if picking something up from the floorboard or putting something down on the

floorboard. *Id.* As the officer approached the vehicle, Payne quickly jammed a black leather

bag down to the floorboard thus concealing it from view. *Id.* The officer asked for Payne's

license and the vehicle's registration. *Id.* During this time, the passenger became

"increasingly nervous." *Id.* In contrast, Payne appeared to be nervous only when he was

placing the black leather bag on the floorboard, and remained calm after that. *Id.*

When another patrol unit arrived on the scene, the officer had Payne exit the vehicle.

*Id.* The officer reached into the vehicle, retrieved the black leather bag, patted the bag's

exterior, and felt the outline of a handgun. *Id.* at 569. Upon opening the bag, the officer

found a Ruger .357 Magnum handgun, eight cartridges, and a marijuana cigarette. *Id.*

Prior to trial, Payne moved to suppress the items recovered from the leather bag. *Id.*

at 567. The trial court denied his motion, and he was subsequently convicted of a handgun

violation and possession of a controlled dangerous substance. *Id.*

On appeal, he alleged that the trial court erred in denying his motion to suppress. We

agreed:

> The record before us discloses absolutely no "specific and articulable
> facts" from which a reasonable inference can be drawn that Payne was armed
> and dangerous. All [the officer] saw was a car double parked, a motion by

15

Payne during which Payne either placed something on or took something from the floor, a jamming of a "black bag . . . to the floorboard," and "furtive" glances by a person who was a passenger in Payne's car. How anyone can reasonably deduce from those facts that Payne had a gun totally eludes us, unless [the officer] was clairvoyant. [The officer] might just as easily have concluded that Payne had placed on the floor of the car narcotics, or pornographic matter, or receipts of a "numbers" pickup, or money or jewelry. The list is innumerable.

*Payne*, 65 Md. App. at 574.

In our view, *Payne* is distinguishable. Appellant was parked in an area known for narcotics activity. And, in relating observations regarding the hotel parking lot and the "furtive movements" as they approached the vehicle, Detective Melnyk specifically testified to his concern for officer safety based on the possibility that weapons were involved, stating "[a]t that point, for the safety of myself and Detective Young, they were requested to exit the vehicle and we put them in handcuffs just to make sure they didn't have any weapons and detaining them." The officer clearly articulated his concern that appellant was armed and dangerous, thus justifying a pat-down for weapons during the detention.[4]

---

[4] In his reply brief, appellant cites several cases concerning "no-knock warrants" for the proposition that even "probable cause to believe that a person is selling drugs does not, by itself, constitute reasonable suspicion that the individual is armed and dangerous." The Supreme Court explained:

In order to justify a "no-knock" entry, the police must have a *reasonable suspicion* that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the

16

The justification for a further *Terry* detention arose when appellant and DeLillo gave, what the suppression court found were conflicting stories for why they were parked side by side in the Days Inn parking lot and DeLillo got into appellant's vehicle. DeLillo stated that he was at the hotel to meet some unidentified individual named "Phil," and watch an Orioles game. In contrast, appellant advised that he was going to meet his cousin at the Maryland Live Casino. There was no explanation as to why they were together.

We are persuaded that *Carter v. State*, 143 Md. App. 670, *cert. denied*, 369 Md. 571 (2002), addresses the conflicting accounts, and, in fact, informs our analysis of appellant's other arguments. In *Carter*, the Howard County Police Department received a call on a Sunday evening when Deep Run Elementary School was not in session that a suspicious van was parked in the parking lot at the school. 143 Md. App. at 678-79. The call advised that

---

destruction of evidence. This standard-as opposed to a probable-cause requirement-strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries.

*Richards v. Wisconsin*, 520 U.S. 385, 394 (1997) (emphasis added).

Even comparing "no-knock" warrants and entries to a *Terry* stop and frisk, the standard remains whether the officer had a reasonable articulable suspicion, under the particular circumstances, that a person is armed and dangerous. *See In Re: David S.*, 367 Md. at 541; *see also Bailey*, 412 Md. at 367 ("The officer has reason to believe that an individual is armed and dangerous if a reasonably prudent person, under the circumstances, would have felt that he was in danger, based on reasonable inferences from particularized facts in light of the officer's experience").

individuals may be selling drugs from the vehicle and that there were juveniles "approaching the van and leaving the van." *Id.* at 679-80. When police arrived six minutes after the call, a van was the only vehicle parked in the school parking lot, and two persons were seen walking away from the van. When those individuals saw the police, they began running. *Id.* at 680-81. The van also began to pull away, but was stopped by the police. *Id.* at 681.

The driver of the van could not produce an operator's license. *Id.* at 682. The driver explained that they were parked in the school parking lot "picking someone up," but he could not identify that person. *Id.* The front seat passenger, who was independently questioned about why the van was in the school parking lot, explained that they were simply "hanging out." *Carter*, 143 Md. App. at 682.

This Court upheld the motion court's ruling that an investigative detention was warranted under such circumstances, observing:

> For purposes of analysis, a *Terry*-stop is not frozen in time at the split second of its inception. It is a continuing investigative activity, and as it unfolds, reasonable suspicion may mount. As suspicion mounts, moreover, it may justify a longer detention than would initially have been justified.

*Id*.

Further:

> The fundamental purpose of a *Terry*-stop, based as it is on reasonable suspicion, is to confirm or to dispel that suspicion by asking for an explanation of the suspicious behavior. A major factor in then determining whether to terminate or to prolong the *Terry*-stop, therefore, is necessarily the

18

nature of the response or responses given to the police.

*Id*. at 683-84.

We rejected appellant's argument that he was under arrest because he "was not free to leave," stating, "Of course, he wasn't.  That's why this was a *Terry*-stop requiring the *Terry* level of Fourth Amendment justification.  Had he been free to leave, this would have been a mere accosting and the Fourth Amendment would not even have been implicated." *Id*. at 677.  We also discounted any attempt to suggest that the circumstances could be explained as innocent behavior:

> There might, of course, have been an innocent explanation for what the van was doing on the school parking lot on a Sunday evening.  There might have been an innocent explanation for why it started to leave as the police approached.  There might have been an innocent explanation for why the two persons on foot suddenly began to run at the approach of the police.  There might have been an innocent explanation for the inherently strange and inconsistent purposes for being there stated by the driver and the front seat passenger.  As *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989), explained, however:
>
> > *Terry* itself involved "a series of acts, each of them perhaps innocent" if viewed separately, but which taken together warranted further investigation." We noted in [*Illinois v*.] *Gates*, [462 U.S. 213 (1983)] that "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." That principle applies equally well to the reasonable suspicion inquiry.

19

*Carter*, 143 Md. App. at 685 (emphasis and parallel citations omitted); *see also Ofori*, 170 Md. App. at 248 ("Reasonable articulable suspicion is assessed not by examining individual clues in a vacuum but by getting a 'sense' of what may be afoot from the confluence of various circumstances. Suspicion, particularly to a trained law enforcement officer, may be greater than the sum of its parts.").

After concluding that a continued detention was reasonable, we considered the scope of that detention. We emphasized that this was a *Terry*-stop based on reasonable articulable suspicion that criminal activity was afoot, and not, as appellant would have it, a mere traffic stop or a pretext stop under *Whren v. United States*, 517 U.S. 806 (1996). *Carter*, 143 Md. App. at 689. Pointing out that it is "very clear that the permitted temporal scope of a *Terry*-stop is not something that may be measured by the ticking of the clock alone," *id.* at 689-90, we explained:

> When, by contrast, the energizing articulable suspicion is that a violation of the drug laws may be afoot, the time constrictions on the *Terry*-stop are very different. The bringing of a drug-sniffing canine to the scene is in the direct service of that investigative purpose and the measure of reasonableness is simply the diligence of the police in calling for and procuring the arrival of the canine at the scene. This use of a trained dog, as will be discussed, is an investigative practice that is looked upon with favor. In the present case, of course, the reasonable suspicion was that the van and its occupants were involved in the distribution of controlled substances. The permitted scope of the stop depended, therefore, on how long it would reasonably take to get a drug-sniffing canine to the school parking lot.

*Id*. at 693.

20

In *Carter*, after the van was stopped, ten minutes went by while the police asked for the driver's operator's card and engaged in a conversation resulting in inconsistent stories between the driver and passenger. Consent for a search was requested and refused. At that point, a drug dog was requested and arrived less than twenty-five minutes later. *Id*. at 696. The dog alerted on the vehicle and a subsequent search resulted in the recovery of marijuana from the van. *Id.* at 698. We concluded that there was no lack of diligence in having the drug dog respond to the scene of the *Terry*-stop and we affirmed the motion court's ruling denying the motion to suppress that marijuana. *Id.*

A similar conclusion is warranted in this case, especially when we consider the brevity of the overall detention prior to the alert by the drug dog. At around 6:50 p.m., within five minutes of parking in the Days Inn lot, and after DeLillo arrived and got into appellant's vehicle, the two detectives decided to approach appellant's Jeep. At approximately 6:52 p.m., Detective Melnyk decided to contact police dispatch to request that a K-9 unit respond to the scene. The K-9 arrived shortly thereafter, and at 7:00 p.m., alerted on the passenger side door of the Jeep. The entire encounter, from the moment the officers decided to approach appellant's Jeep, to the alert by the drug dog, lasted approximately ten minutes. This was hardly unreasonable. *See, e.g. Carter*, 143 Md. App. at 696 (twenty-five minute delay while police awaited arrival of a drug sniffing dog permissible); *see also Ofori*, 170 Md. App. at 252-53 (concluding that a seventeen minute delay between when a drug

21

dog was requested as part of a *Terry*-stop and when the dog alerted, was not "remotely unreasonable").

Finally, we are persuaded that appellant's reliance on *Longshore v. State*, 399 Md. 486, *Bailey v. State*, 412 Md. 349, and *Dixon v. State*, 133 Md. App. 654, is misplaced as those cases are distinguishable on their facts. In *Longshore*, the Charles County Sheriff's Department received a videotape from a confidential informant showing Longshore and John Carlson getting into a car parked in a mall parking lot, during the middle of the day, where they remained for a short time while a third person stood by the driver's door. 399 Md. at 494-95, 514. Apparently after the two men left his vehicle, Longshore drove away from the mall for a short period of time. *Id.* at 495. The police set up surveillance of the mall and observed Longshore return to the mall and then walk inside, where he met with, and spoke to, the two people who were earlier recorded on the videotape near Longshore's vehicle. *Id.* Subsequently, after Carlson drove away from the mall, the police stopped his vehicle and Carlson consented to a search. *Id.* In that search, police recovered trace amounts of marijuana and cocaine from Carlson's vehicle. *Id.*

Around the same time, a drug sniffing dog scanned Longshore's parked vehicle while Longshore was inside the mall, but did not alert to the presence of drugs. *Id.* When Longshore returned to his car and left the mall, he was stopped by a police officer. *Longshore*, 399 Md. at 495. He did not consent to a search of his vehicle. The officer,

22

knowing that the drug dog did not alert on Longshore's parked vehicle, nevertheless called for the drug dog to return to conduct a scan. While awaiting the arrival of the dog, Longshore was placed in handcuffs. *Id.* at 495-96.

When the dog arrived about two minutes later, with the window to Longshore's vehicle now open, the dog alerted to the presence of drugs in the rear "wheel well underneath the vehicle." *Id.* at 496. An initial search uncovered no drugs in the rear area of the vehicle or underneath it. *Id.* At that time, the drug dog was allowed inside the vehicle, and the scan and subsequent search of the car revealed crack cocaine in the center console area of the ceiling. *Id.*

In determining what standard to apply, the Court of Appeals held that when Longshore was handcuffed, the stop escalated from a detention to an arrest. The Court reasoned:

> [T]here was no suspicion that a violent crime had occurred, nor any reason to believe that Longshore was armed or dangerous. The arresting officer acknowledged that, despite Longshore's nervousness, he was cooperative and did not exhibit any threatening behavior. The officers did not indicate that they were, in any way, concerned for their safety. Moreover, there was no reason to believe that Longshore was a flight risk. There was no indication by the police that they believed, nor any objective basis for concluding, that Longshore would run.

*Id.* at 514.

Further, the Court held there was no probable cause to arrest Longshore:

What we are left with is a videotape that, although coming from a previously reliable source, reflects no drug activity, only innocuous or at worst ambiguous, behavior, occurring primarily in a public setting, trace amounts of drugs with no immediate or clear connection to Longshore, a prior criminal record, nervous behavior, and inconsistent results - she twice failed to alert to the presence of drugs - from a drug dog. While these facts may have provided an officer reasonable suspicion to conduct further investigation, they do not provide a substantial basis for a determination of probable cause, the standard by which we are bound to evaluate the validity of the petitioner's arrest.

*Longshore*, 399 Md. at 535.

In contrast to the evidence in the case now before us, there was no evidence that the officers were concerned about their safety, or that Longshore was armed and dangerous. In addition, the encounter occurred in a public mall parking lot, in the middle of the day and there was no indication or suggestion that this area was known as a high crime area. In addition, the drug dog failed to alert twice on the vehicle.

In *Bailey*, an officer observed the defendant, in an area known for drug activity, standing alone alongside a house, with an odor of ether emanating from his person. 412 Md. at 359-60. According to the officer, the odor of ether is "associated with phencyclidine, more commonly known as PCP" but possession of ether is not illegal. *Id.* When the officer asked the defendant, who had glassy eyes, if he lived at the home next to where he was standing, the defendant ignored the officer's inquiry. *Id.* at 360. The officer "reached over and grabbed both of [his] hands . . . and had him place them over his head." *Id.* The officer then conducted a search of Bailey and uncovered a glass vial containing liquid, later determined

24

to be PCP, in Bailey's front pocket. *Id.*

The Court determined that Bailey was "seized" for Fourth Amendment purposes. *Id.* at 365. The Court held that, placing Bailey's hands over his head was a seizure that was "presumptively invalid" unless it could be justified by "a reasonable, articulable suspicion of a threat to officer safety or by an exception to the warrant requirement." *Bailey*, 412 Md. at 366. The Court rejected the circuit court's determination that the officer had engaged in a valid investigatory stop and frisk pursuant to *Terry*. *Id.* at 367. Because the officer had no reasonable suspicion to believe that criminal activity was afoot, the Court held there was no basis to conduct a *Terry* stop, but even "assuming *arguendo* that [the officer] had reasonable, articulable suspicion to believe that criminal activity was afoot . . . he still lacked the basis for a protective *Terry* frisk[,]" because he had no reasonable, articulable suspicion that Bailey was armed and dangerous. *Id.* at 368. And, even if a frisk were proper, it went beyond the valid "pat down" for weapons when the officer reached into Bailey's pocket and retrieved a vial, when "the incriminating nature of the object in the defendant's pocket was not immediately apparent upon his initial touch of the object in the pat-down." *Id.* at 370.

The Court concluded that the officer's conduct amounted to a *de facto* arrest, which was not supported by probable cause.

> In the present case, the officer took complete control of the situation in conducting a general exploratory search of the petitioner, removing the vial from his pocket and taking him into custody. As discussed *infra*, the officer

25

had no objective reason to suspect that the petitioner was armed and dangerous, nor did the officer's testimony furnish a basis for a suspicion that the petitioner was armed. Further, the search itself exceeded the scope of a valid *Terry* frisk. The search undertaken in the present case was only valid if it was undertaken within the context of an arrest, which must be supported by probable cause.

*Id.* at 374.

Again, in contrast to this case, there was no articulated concern for officer safety or reason to believe that the defendant in *Bailey* was armed and dangerous. And, it was clearly apparent that the search exceeded the permissible scope of a *Terry* frisk when the officer searched Bailey and removed evidence from his pocket.

In *Dixon*, a Montgomery County police officer received a phone call from a confidential informant with whom he had worked on prior occasions. 133 Md. App. at 658. The informant told him that Dixon would be transporting approximately ten pounds of marijuana to the second level of a parking garage adjacent to a mall inside a dark-colored Acura at around 8:15 p.m. The police officer was familiar with Dixon from prior surveillance. *Id.* at 659.

At approximately 7:00 p.m. when the police arrived at the parking lot to set up surveillance, they noticed that Dixon's Acura was already parked on the second level. *Id.* at 660. At 8:15 p.m., Dixon emerged from a stairwell, walked to his car, looked around, and then returned to the stairwell. *Id.*

26

At short time later when Dixon returned and entered his car, the police blocked in Dixon's vehicle. *Id.* The officer who had received the tip looked in the passenger compartment of the vehicle but did not see any contraband. He then opened the trunk of the vehicle, and found a rubber bag that held nine gallon-sized bags, each containing suspected marijuana, inside a larger red rubber bag. *Id.*

On appeal, we concluded that Dixon was arrested when the police blocked in his car, stating:

> As we see it, the events in the garage exceeded an investigatory stop under *Terry* and its progeny. Accordingly, we do not agree with either the State or the trial court that appellant was merely detained prior to the car search. Instead, we conclude that the officers arrested appellant at the time they blocked his car, removed him from his vehicle, and handcuffed him.

*Dixon*, 133 Md. App. at 673.

In *Dixon*, the police did not "testify to any significant corroboration of the tip," which was "sorely lacking in meaningful detail." *Id.* at 696. Here, the investigation was based on the personal observations of an experienced detective, trained in narcotics investigations. When the detectives approached the vehicles, there was no effort to block in either of the vehicles in this case, and the record supports a conclusion that their purpose in doing so was to conduct further investigation.

In sum, we conclude that appellant was detained based on reasonable articulable suspicion that criminal activity was afoot until such time as the canine unit alerted. Because

27

that detention did not amount to an arrest, we need not consider the State's alternative argument that a prior arrest was supported by probable cause.

When the alert occurred, appellant could be lawfully arrested and searched incident to arrest. *See Belote v. State*, 411 Md. 104, 113 (2009) ("[T]he fact of a custodial arrest alone is sufficient to permit the police to search the arrestee"); *see also Scribner v. State*, 219 Md. App. 91, 99, *cert. denied*, 441 Md. 63 (2014) ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest. The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." (Citation omitted)).

After the ensuing recovery of a hotel room key, cell phone text messages, the narcotics recovered from DeLillo, and DeLillo's implication of appellant in narcotics distribution, there was a substantial basis for finding probable cause to issue a warrant for the search of appellant's hotel room. *See Greenstreet v. State*, 392 Md. 652, 667 (2006) (in assessing the issuance of a search warrant, "[w]e determine first whether the issuing judge had a substantial basis to conclude that the warrant was supported by probable cause"); *see also State v. Faulkner*, 190 Md. App. 37, 47 (2010) ("The substantial basis standard involves something less than finding the existence of probable cause, and is less demanding than even the familiar 'clearly erroneous' standard by which appellate courts review judicial fact finding in a trial setting." (Citation omitted)).

Accordingly, we conclude the motions court properly denied the motion to suppress in this case.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT**.